**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ZEIGLER AUTO GROUP II, INC., a Michigan corporation, and ZEIGLER CHEVROLET – SCHAUMBURG, LLC, a Michigan limited liability company, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:19-cv-02748 |
| v. | ) ) | Judge John Robert Blakey |
| HORACIO CHAVEZ a/k/a JOSE CHAVEZ, and BILL STASEK CHEVROLET, INC., an Illinois corporation, | ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
<u>MOTION FOR ENTRY OF A PRELIMINARY INJUNCTION</u>**

Date: May 14, 2019

Michael J. Grant (ARDC #6275028)
Jacob B. Berger (ARDC #6318332)
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
(312) 762-9450
mgrant@tdrlawfirm.com
jberger@tdrlawfirm.com

*Attorneys for Plaintiffs Zeigler Auto Group II,
Inc. and Zeigler Chevrolet – Schaumburg, LLC*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................2

    A.    Zeigler Chevrolet And Its Business. ......................................................................2

    B.    Chavez's Employment Relationship With Zeigler. ................................................3

    C.    Chavez Breaches The Agreement With Stasek Chevrolet's
        Knowledge, Support, And Encouragement. ..........................................................5

ARGUMENT ...........................................................................................................................7

I.    Legal Standard For Issuance Of A Preliminary Injunction Pursuant to
    Rule 65. ...........................................................................................................................7

II.    The Court Should Enter A Preliminary Injunction Against Defendants To
    Stop Chavez From Breaching The Agreement And To Stop Stasek
    Chevrolet From Interfering With The Agreement. ...........................................................7

    A.    Zeigler Is Likely To Succeed On The Merits. .......................................................7

        1.    Zeigler Is Likely To Succeed On Its Breach Of Contract
            Claim Against Chavez. ...............................................................................7

            a.    The Agreement Is Valid And Enforceable Because It
                Is Reasonable In Duration And Scope. ............................................8

            b.    Chavez Breached The Agreement And Caused And
                Continues To Cause Zeigler to Suffer Damages. ..........................11

        2.    Zeigler Is Likely To Succeed On The Merits Of Its Tortious
            Interference Claim Against Stasek Chevrolet. ............................................12

    B.    Zeigler Has Suffered And Will Continue To Suffer Irreparable Harm
        In The Absence Of Preliminary Injunctive Relief. .................................................13

    C.    Zeigler Lacks An Adequate Remedy At Law. .......................................................15

    D.    There Will Be No Harm To The Public Interest If The Injunction
        Issues. ...................................................................................................................15

i

E. The Balance Of Hardships Strongly Weighs In Favor Of Entering A Preliminary Injunction. ..........................................................................................16

CONCLUSION ............................................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Best Team Ever, Inc. v. Prentice*,
    No. 319026, 2015 WL 3874477 (Mich. App. June 23, 2015) .................................................8

*Bristol Window & Door, Inc. v. Hoogenstyn*,
    650 N.W.2d 670 (Mich. App. 2002) ........................................................................................8

*Brown Dairy Equipment v. Lesoski*,
    No. 291372, 2010 WL 4485919 (Mich. App. Nov. 9, 2010) .................................................10

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
    511 F.3d 535 (6th Cir. 2007) ...............................................................................9, 10, 14, 15

*Coates v. Bastian Brothers, Inc.*,
    741 N.W.2d 539 (Mich. App. 2007) ................................................................................9, 10

*Consulting Co. v. Walling*,
    851 F. Supp. 839 (E.D. Mich. 1994) ......................................................................................14

*Diginet, Inc. v. Western Union ATS, Inc*,
    958 F.2d 1388 (7th Cir. 1992) ...............................................................................................16

*Dunn v. Bennett*,
    846 N.W.2d 75 (Mich. App. 2013) ..........................................................................................7

*Edgebrook Bank v. FDIC*,
    No. 15-cv-2759, 2015 WL 1918978 (N.D. Ill. Apr. 28, 2015) ...............................................7

*Follmer, Rudzewicz & Co., P.C. v. Kosco*,
    362 N.W.2d 676 (Mich. 1984) ................................................................................................9

*Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*,
    430 F.3d 432 (7th Cir. 2005) ...................................................................................................7

*Jim-Bob, Inc. v. Mehling*,
    443 N.W.2d 451 (Mich. App. 1988) ......................................................................................12

*Lowry Comp. Prods., Inc. v. Head*,
    984 F. Supp. 1111 (E.D. Mich. 1997) .........................................................................8, 13, 14

*Owens v. Hatler*,
    129 N.W.2d 404 (Mich. 1964) ..............................................................................................11

iii

*Robert Half Int'l, Inc. v. Van Steenis*,
    784 F. Supp. 1263 (E.D. Mich. 1991) .................................................................................... 10

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ........................................................................................... 7, 16

*St. Clair Med., P.C. v. Borgiel*,
    715 N.W.2d 914 (Mich. App. 2006) ................................................................................ 8, 9

*Tata Consultancy Services v. Systems International*,
    31 F.3d 416 (6th Cir. 1994) ................................................................................................ 12

**Statutes**

Michigan Comp. Laws § 445.774a(1) .............................................................................................. 8

## INTRODUCTION

This motion seeks to enjoin on a preliminary basis Defendants Horacio Chavez a/k/a Jose Chavez ("Chavez") and Bill Stasek Chevrolet, Inc. ("Stasek Chevrolet") to prevent the ongoing breaches of Chavez's Non-Compete & Non-Solicitation Agreement ("Agreement") with Zeigler Auto Group II, Inc. ("Zeigler Auto") and Zeigler Chevrolet-Schaumburg, LLC ("Zeigler Chevrolet") (together "Zeigler"), as well as Defendants' intentional poaching of Zeigler's employees, and their misappropriation of Zeigler's confidential information.

Chavez was a highly compensated general manager of Zeigler Chevrolet. Zeigler trusted Chavez with access to its well-trained employees, its long-term advertising partners and customers, and its most confidential and sensitive business information. Chavez entered into an agreement with Zeigler that prohibited him for a period of 24 months after his resignation from: (1) working for a competitor of Zeigler Chevrolet, (2) attempting to induce or influence employees of Zeigler to resign their employment with Zeigler and to start working for another company; or (3) using or disclosing Zeigler's confidential information.

On January 28, 2019, Chavez resigned as the general manager of Zeigler. The next day, Zeigler sent Chavez a letter reminding him of his ongoing obligations under the Agreement. Shortly thereafter, Chavez asked Zeigler's President Aaron Zeigler if Zeigler would consent to Chavez working for Stasek Chevrolet, a direct competitor located only 13 miles away. Mr. Zeigler informed Chavez that Zeigler would not consent to him working for Stasek Chevrolet and that Zeigler expected Chavez to honor his contractual obligations.

In direct violation of his contractual obligations, however, Chavez immediately went to work for Stasek Chevrolet as its general manager. Chavez then induced a Zeigler Chevrolet employee to leave Zeigler and join Stasek Chevrolet. He also used Zeigler's confidential

information to contact Zeigler's marketing partner to obtain for Stasek Chevrolet the same confidential preferred advertising rate as Zeigler. Stasek Chevrolet had full knowledge of Chavez's obligations under the Agreement and allowed him to breach those obligations for its own gain. Chavez's breaches of the Agreement and Stasek Chevrolet's interference with the Agreement are ongoing. Accordingly, Zeigler respectfully requests that the Court issue a preliminary injunction against Defendants to halt their misconduct.

## FACTUAL BACKGROUND

### A.    Zeigler Chevrolet And Its Business.

Zeigler owns automobile dealerships located predominantly in Illinois and Michigan. (Exhibit 1, Aaron Zeigler Declaration, ¶¶ 5-6.) Zeigler operates in a highly competitive industry. (*Id.* at ¶ 8.) Zeigler spends considerable time, effort, money, and resources to develop its customer list, a list of prospective customers and leads, referral sources and networks, confidential business processes, sales processes, negotiating tactics, business development initiatives, advertising and marketing plans and strategies, and employee hiring practices and philosophies. (*Id.* at ¶¶ 9-10.) Zeigler maintains all this information as confidential. (*Id.* at ¶¶ 10-11.) Only certain Zeigler employees have access to this information, and only on an as-needed basis and only after signing confidentiality agreements. (*Id.*) Zeigler also makes significant investments in training and retaining its employees. (*Id.* at ¶ 12.) In addition, the commercial terms that Zeigler negotiates with its marketing and advertising partners, including confidential preferred advertising rates, are maintained as confidential, are not generally known in the marketplace, and give Zeigler a competitive advantage over its competitors. (*Id.* at ¶¶ 13-14.) One of Zeigler's advertising and marketing partners is The Daily Herald. (Exhibit 2, Joe St. Germain Declaration, ¶ 22.) Zeigler has negotiated a confidential preferred advertising rate with The Daily Herald. (*Id.* at ¶¶ 23-25.)

**B.      Chavez's Employment Relationship With Zeigler**

On August 16, 2017, Zeigler Chevrolet hired Chavez as its general manager.  (*Id.* at ¶ 15; Ex. 2 at ¶ 10.)  Zeigler trained Chavez on how to be a general manager of an automobile dealership. (Ex. 2 at ¶ 11.)  Chavez was responsible for, among other things, hiring and terminating Zeigler Chevrolet's employees; determining Zeigler Chevrolet employees' rates of pay; assisting in the development of advertising and marketing strategies; negotiating terms and agreements with Zeigler Chevrolet's advertising and marketing partners; overseeing all sales and marketing activities at the dealership; overseeing inventory management at the dealership; ensuring proper documentation and collection of sales contracts, finance contracts, sales incentives, and manufacturer rebates; ensuring that the dealership is properly staffed; overseeing the day-to-day operation of the dealership; and managing expenses. (Ex. 1 at ¶ 16; Ex. 2 at ¶ 12.)  Because of his important role and level of responsibility at Zeigler Chevrolet, Chavez was highly compensated. (*Id.* at ¶ 21.)  In 2018 alone, Zeigler paid Chavez total compensation of $255,395.  (*Id.*)

Chavez also was a member of Zeigler's Performance Group, which is made up of executives from the Zeigler dealerships.  (*Id.* at ¶ 17.)  The Performance Group often discusses and analyzes confidential financial information and records from all of Zeigler's dealerships, Zeigler's business processes, sales processes, negotiating tactics, business development initiatives, potential acquisitions, hiring practices and philosophies, legal matters, and other confidential performance data.  (*Id.* at ¶ 18.) All of the information that the Performance Group shares, reviews, discusses, and analyzes is highly confidential.  (*Id.* at ¶ 19.)

Zeigler Chevrolet had to provide Chavez with access to Zeigler's highly sensitive and confidential information so that Chavez could perform his job duties.  (*See id.* at ¶¶ 9-14, 16, 17- 20; Ex. 2 at ¶¶ 22-26.)  Accordingly, Zeigler requested that Chavez enter into a restrictive

covenant. (Ex. 1 at ¶ 20.) The restrictive covenant limited Chavez's post-employment activities as a condition of his continued employment and for other valuable consideration, including a bonus. (*Id.* at ¶ 20 and Ex. A.) Chavez and Zeigler entered into the Agreement effective August 16, 2017. (*Id.;* Ex. 2 at ¶ 13.)

Chavez agreed that for a period of 24 months following the termination of his employment with Zeigler Chevrolet for any reason, he "shall not **directly or indirectly represent or be employed** by a Competitor of the Company." (Ex. 1, Ex. A at §§ 1-2 (emphasis in original).) The Agreement defines a "Competitor of the Company" to mean "any automobile dealership or new or used vehicle dealership related entity located within **fifty (50) miles** of any of the Company's locations which currently include . . . Zeigler Chevrolet – Schaumburg, LLC (1230 East Golf Road, Schaumburg, IL 60173) . . . ." (*Id.* at § 1.)

Chavez also agreed that for a period of 24 months following termination of his employment with Zeigler Chevrolet for any reason, he will not "induce or influence or attempt to influence any employee of the Company to terminate employment with the Company, or advise or recommend to any other person, firm, partnership, individual or corporation or any other entity that it employ, or solicit for employment, any person who is an employee of the Company." (*Id.* at § 4.)

Chavez further acknowledged that he would have "access to and knowledge of confidential and secret information that is not generally known to persons who are not employed or associated with the Company," including but not limited to "all internal management reports, customer names and addresses, business and marketing plans, and financial information." (*Id.* at § 3.) Chavez agreed not to "utilize or disclose such confidential and secret information to any person." (*Id.*)

The Agreement contained three other important promises and agreements from Chavez. *First*, Chavez promised and agreed that "in the event [Chavez] breaches any of the obligations

4

under this Agreement, the monetary damages caused to [Zeigler] will be difficult to ascertain and not easily proven following such breach." (*Id.* at § 5.) Accordingly, Chavez agreed that $125,000 would be a reasonable estimate of the initial damages that Zeigler would suffer for each breach of Chavez's obligations under the Agreement. (*Id.* at § 5.) *Second,* Chavez agreed that he received adequate consideration in exchange for entering into the Agreement. Specifically, he agreed that his compensation plan "including salary, bonus and benefits, has been designed in such a way to adequately compensate and provide consideration to [Chavez] for the provisions agreed to by [Chavez] in this Agreement." (*Id.* at § 6.) *Third,* Chavez agreed that the Agreement will be "construed, interpreted, and enforced" pursuant to the laws of the State of Michigan. (*Id.* at § 8.)

## C. Chavez Breaches The Agreement With Stasek Chevrolet's Knowledge, Support, and Encouragement.

On January 28, 2019, Chavez suddenly and unexpectedly resigned his employment with Zeigler Chevrolet. (Ex. 1 at ¶ 22; Ex. 2 at ¶ 14.) The very next day, Zeigler's attorney sent Chavez a letter reminding him of his obligations under the Agreement. (Ex. 1 at ¶ 24; Dkt. No. 1, Ex. 2.) The letter also specifically stated that Zeigler expected that Chavez would comply with all of the terms of the Agreement and warned Chavez of the consequences of not complying with the Agreement. (*Id.*)

In February 2019, shortly after his resignation, Chavez responded to the January 29, 2019 letter by contacting Mr. Zeigler and asked if Zeigler would consent to Chavez working at Stasek Chevrolet. (*Id.* at ¶ 25.) Mr. Zeigler responded that Zeigler would not consent to Chavez working at Stasek Chevrolet and expected that Chavez would abide by all of his obligations under the Agreement. (*Id.* at ¶ 26.)

Zeigler later learned that Stasek Chevrolet hired Chavez as its general manager. (*Id.* at ¶ 27; Ex. 2 at ¶ 15.) Stasek Chevrolet is a direct competitor of Zeigler located only 13 miles away

5

from Zeigler Chevrolet. (Ex. 1 at ¶ 25; Ex. 2 at ¶ 16.)

But Chavez's breaches of the Agreement did not stop there. Chavez contacted Dimitrios Maravelas ("Maravelas"), Zeigler Chevrolet's used car manager, and induced him to resign from Zeigler Chevrolet and to seek employment with Stasek Chevrolet as its used car manager. (Ex. 1 at ¶ 30; Ex. 2 at ¶ 19.) On April 12, 2019, Maravelas resigned from his employment at Zeigler and began working for Stasek Chevrolet as its used car manager. (Ex. 1 at ¶¶ 31-32; Ex. 2 at ¶¶ 20-21.)

Stasek Chevrolet also encouraged and assisted Chavez in violating his confidentiality obligations under the Agreement. In April 2019, after he began working at Stasek Chevrolet, Chavez disclosed Zeigler's Daily Herald preferred advertising rate to Stasek Chevrolet and directed Stasek Chevrolet to contact Zeigler's representative at Daily Herald to try to obtain the same preferred advertising rate for Stasek Chevrolet. (Ex. 2 at ¶¶ 22-29.) Chavez persisted in his breach of the Agreement and directed a Stasek Chevrolet employee to contact another representative at the Daily Herald to obtain Zeigler's confidential preferred advertising rate. (*Id.* at ¶ 30.)

On April 16, 2019, Zeigler sent a cease and desist letter to Stasek Chevrolet. (Ex. 1 at ¶ 33; Dkt. No. 1, Ex. 3.) The cease and desist letter informed Stasek Chevrolet that Chavez's employment with Stasek Chevrolet, his poaching of Maravelas, and his disclosure of confidential information to Stasek Chevrolet all violated the Agreement. (*Id.*) On April 18, 2019, Zeigler sent a similar cease and desist letter to Chavez informing him that he had breached the Agreement. (Ex. 1 at ¶ 34; Dkt. No. 1, Ex.t 4.) On April 22, 2019, Defendants' attorney informed Zeigler that Stasek Chevrolet would not terminate Maravelas and Chavez. (Ex. 1 at ¶ 35.)

6

<u>**ARGUMENT**</u>

**I.      Legal Standard For Issuance Of A Preliminary Injunction Pursuant To Rule 65.**

The Court should issue a preliminary injunction where, as here, a plaintiff shows that it will suffer irreparable harm in the absence of injunctive relief.  A preliminary injunction should be entered where the plaintiff demonstrates: (a) there is a reasonable likelihood of success on the merits; (b) irreparable harm will occur without the preliminary injunctive relief; (c) there is no adequate remedy at law; and (d) the injunction does not harm the public interest.  *See Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005); *Edgebrook Bank v. FDIC*, No. 15-cv-2759, 2015 WL 1918978, at *4 (N.D. Ill. Apr. 28, 2015).

**II.     The Court Should Enter A Preliminary Injunction Against Defendants To Stop Chavez From Breaching The Agreement And To Stop Stasek Chevrolet From Interfering With The Agreement.**

**A.      Zeigler Is Likely To Succeed On The Merits.**

To establish a likelihood of success on the merits, a plaintiff need only raise a fair question as to the existence of the right claimed and show that his chances of success are "better than negligible."  *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).  As discussed below, Zeigler is likely to succeed on the merits of its claims against Defendants.

**1.      Zeigler Is Likely To Succeed On Its Breach Of Contract Claim Against Chavez.**

Zeigler is likely to succeed on its breach of contract claim against Chavez because of Chavez's clear breaches of the Agreement.  Under Michigan law, which expressly governs the Agreement, a party claiming a breach of contract must establish: "(1) that there was a contract; (2) that the other party breached the contract; and (3) that the party asserting breach of contract suffered damages as a result of the breach."  *Dunn v. Bennett*, 846 N.W.2d 75, 79 (Mich. App. 2013) (*quoting Miller-Davis Co v. Ahrens Const., Inc.*, 817 N.W.2d 609, 619 (Mich. App. 2012)).

There can be no dispute that Zeigler and Chavez entered into a valid and enforceable agreement, that Chavez breached and continues to breach the Agreement, or that Zeigler suffered damages.

> **a.    The Agreement Is Valid And Enforceable Because It Is Reasonable In Duration And Scope.**

Michigan law expressly authorizes non-compete agreements restricting employees from competing with their former employers, provided that such agreements are reasonable in duration and scope.  Specifically, Michigan Comp. Laws § 445.774a(1) provides that:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business.  To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

MCL § 445.774a(1).

The Agreement is valid and enforceable because it is reasonable as to its duration, geographical area, and the type of employment or line of business.  *Id.*; *see also St. Clair Med., P.C. v. Borgiel*, 715 N.W.2d 914, 918-19 (Mich. App. 2006).

Michigan courts have routinely upheld temporal restrictions that are far longer than the 24-month restriction here.  *Lowry Comp. Prods., Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997) (stating that "courts have upheld time periods of six months to three years"); *Best Team Ever, Inc. v. Prentice*, No. 319026, 2015 WL 3874477, at *3 (Mich. App. June 23, 2015) (holding 5-year restriction to be reasonable); *Bristol Window & Door, Inc. v. Hoogenstyn*, 650 N.W.2d 670, 671-72, 678 (Mich. App. 2002) (a three-year, statewide non-competition agreement was enforceable).  The 24-month restriction on Chavez's ability to compete with Zeigler, to poach Zeigler's employees, and to disclose Zeigler's confidential information is plainly reasonable.

8

Chavez was personally responsible for Zeigler Chevrolet's financial performance, its customer relationships, and its relationships with its advertising and marketing partners. Under the circumstances, the 24-month restriction is reasonable given Chavez's important role at Zeigler Chevrolet and his access to Zeigler's employees and confidential information.

Likewise, the Agreement's 50-mile geographic scope is reasonable. A restrictive covenant's geographic scope is reasonable when the restriction is no greater than reasonably necessary to protect an employer's legitimate business interests. "To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill." *St. Clair Med.*, 715 N.W.2d at 919; *see also Coates v. Bastian Brothers, Inc.*, 741 N.W.2d 539, 545-46 (Mich. App. 2007) (non-competition provision prohibiting former general manager's employment with any competitor within 100 miles of any of employer's locations for one year following separation from employment was reasonable and enforceable).

Michigan courts have recognized that confidential information concerning customers, costs, and pricing is protectable by a non-competition covenant. *See, e.g.*, *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 546-49 (6th Cir. 2007) (finding that the plaintiff had a legitimate business interest in preventing the defendant from using plaintiff's confidential information to gain a competitive advantage in plaintiff's industry); *see also Follmer, Rudzewicz & Co., P.C. v. Kosco*, 362 N.W.2d 676, 680-81 (Mich. 1984) ("While an employee is entitled to unrestricted use of general information acquired during the course of his employment or information generally known in the trade or readily ascertainable, confidential information, including information regarding customers, constitutes property of the employer and may be

9

protected by contract") (internal citations omitted).

Further, "an employer has a reasonable business interest in protecting its good will and, specifically, in 'restricting its former employees from enticing away the employer's old customers.'" *Certified Restoration*, 511 F.3d at 548 (citation omitted). "An employee 'who establishes [client] contacts and relationships as the result of the goodwill of his employer's [business] is in a position to unfairly appropriate that goodwill and thus unfairly compete with a former employer upon departure.'" *Id.* (alterations in original) (*quoting St. Clair Med.*, 715 N.W.2d at 920).

Here, the Agreement is reasonably tailored to specifically protect Zeigler from Chavez's unfair competition and his use of Zeigler's confidential information regarding customers, employees, advertising partners, financial information of its dealerships, sales processes and business plans, department policies and best practices, and advertising and marketing partner relationships.

The Agreement is also specifically tailored to protect Zeigler's goodwill with its customers and its advertising and marketing partners, which are critical to Zeigler's financial stability and overall success. *See Brown Dairy Equipment v. Lesoski*, No. 291372, 2010 WL 4485919, * 2 (Mich. App. Nov. 9, 2010). The narrowly tailored restrictions set forth in the Agreement are a reasonable means of restricting Chavez from gaining an unfair business advantage for his or Stasek Chevrolet's benefit. *Accord Coates*, 741 N.W.2d at 545-46 (non-competition provision prohibiting employment with any competitor within 100 miles of any of employer's locations for one year was reasonable); *Robert Half Int'l, Inc. v. Van Steenis*, 784 F. Supp. 1263, 1274 (E.D. Mich. 1991) (finding reasonable a one-year restriction from competing within 50 miles of any of plaintiff's permanent offices).

10

**b.  Chavez Breached The Agreement And Caused And Continues To Cause Zeigler To Suffer Damages.**

Chavez breached Section 2 of the Agreement because he accepted a general manager position with Stasek Chevrolet, Zeigler Chevrolet's direct competitor, that is located only 13 miles away from Zeigler Chevrolet in Wheeling, Illinois.  Chavez's responsibilities as the general manager of Stasek Chevrolet are the same as or substantially similar to his responsibilities as Zeigler Chevrolet's general manager.  Chavez's new employment threatens, has damaged, and continues to damage Zeigler's legitimate business interests.  *See Owens v Hatler*, 129 N.W.2d 404, 406 (Mich. 1964) ("[T]he restraint may be as broad as the business covered by the agreement and of sufficient scope to prevent competition therewith.").

Chavez breached Section 3 of the Agreement by disclosing Zeigler's confidential information about its preferred advertising rate with the Daily Herald to Stasek Chevrolet.  Chavez did so with the express purpose of undermining Zeigler Chevrolet's relationship and goodwill with the Daily Herald.

Further, Chavez has also breached Section 4 of the Agreement because he has directly induced or influenced Maravelas, a Zeigler Chevrolet employee, to resign his employment with Zeigler Chevrolet and to start working for Stasek Chevrolet in an identical position with the same or similar job responsibilities.

Defendants have made clear that Stasek Chevrolet will not terminate Maravelas or Chavez, and thus, Chavez remains in breach of Sections 1 and 2 of the Agreement.  Additionally, since this dispute arose, Defendants never even promised, much less offered, to refrain from using Zeigler's confidential information.  Accordingly, absent injunctive relief, Chavez will continue to breach the Agreement with Stasek Chevrolet's knowledge, approval, and encouragement.

11

### 2. Zeigler Is Likely To Succeed On The Merits Of Its Tortious Interference Claim Against Stasek Chevrolet.

Zeigler is also likely to succeed on its tortious interference with contractual relationship claim against Stasek Chevrolet because Stasek Chevrolet has interfered with the Agreement. Under Michigan law, to establish a claim for tortious interference with a contract, a plaintiff must establish that (1) a valid and enforceable contract exists; (2) a breach of the contract occurred; and (3) the defendant instigated the breach without justification. *See Jim-Bob, Inc. v. Mehling,* 443 N.W.2d 451, 462 (Mich. App. 1988).

To establish the third element, the plaintiff must allege "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in the law for the purpose of invading the contractual rights . . . of another." *Id*. As a matter of law, if a defendant induces another person to break a contract "for the indirect purpose of injuring the plaintiff, *or benefitting the defendant at the expense of the plaintiff,* it is a malicious act, which, in law and in fact, is a wrongful act, and therefore an actionable act, if injury issues from it." *Tata Consultancy Services v. Systems International,* 31 F.3d 416, 423-24 (6th Cir. 1994) (emphasis in original and citation omitted) (rejecting defendant's argument that it merely acted in the interest of economic gain at the expense of a competitor and holding that malice could be inferred because defendant induced employees to break their contracts with plaintiff); *see also Jim-Bob, Inc.,* 443 N.W.2d at 462-63 ("[D]efendant may not, with impunity, sabotage the contractual arrangements of others, and th[e] defendant's cry that its actions were motivated by purely business interests cannot, standing alone, operate as a miracle cure making all that was wrong, right.")

As set forth above, Zeigler has established that the Agreement is a valid and enforceable contract and that Chavez breached it in at least three respects. Further, Zeigler has established that Stasek Chevrolet instigated Chavez's breaches without justification. Given that it is customary for

a general manager at an automobile dealership to enter into a restrictive covenant with the dealership, Stasek Chevrolet knew or should have known that Chavez was barred from working for it, poaching Zeigler Chevrolet employees for it, or disclosing Zeigler's confidential information to it when it hired Chavez. Nevertheless, Stasek Chevrolet hired Chavez, encouraged Chavez to attempt to induce another Zeigler Chevrolet employee to resign and join Stasek Chevrolet in the same position, and encouraged Chavez to use Zeigler's confidential information to damage its relationship with its advertising and marketing partners and to undermine Zeigler's sales, marketing, and advertising strategy. Zeigler also informed Stasek Chevrolet about the existence of the Agreement and that Chavez had breached it when Zeigler sent its April 16, 2019 cease and desist letter to Stasek Chevrolet. Despite that letter, Stasek Chevrolet continues to employ Chavez and Maravelas, and Chavez continues to disclose Zeigler's confidential information to Stasek Chevrolet and to use it for the benefit of Stasek Chevrolet. Accordingly, Zeigler is likely to succeed on the merits of its tortious interference claim against Stasek Chevrolet.

**B. Zeigler Has Suffered and Will Continue To Suffer Irreparable Harm In The Absence Of Preliminary Injunctive Relief.**

Absent immediate injunctive relief, Zeigler will suffer irreparable harm in at least two separate and distinct ways. *First*, "preliminary injunction factors depend mainly on the amount of confidential information that defendant possesses and might be reasonable expected to divulge to [the competitor]." *Lowry,* 984 F. Supp. at 1116. The "more confidential information defendant possesses and the higher the likelihood that defendant will pass that information on to [the competitor], the more the other preliminary injunction factors (particularly irreparable injury and public interest) will weigh in favor of granting the preliminary injunction." *Id.*

Chavez was intimately familiar with Zeigler's most valuable and confidential information by virtue of his position as general manager and by serving in the Performance Group. Chavez

13

knows all of Zeigler's highly confidential business plans; financial information; sales, marketing, and advertising strategies; contractual terms with vendors, including advertisers; business and sales processes; and customers and prospects. Once Stasek Chevrolet learns about all of this confidential information, it readily has the ability to undercut Zeigler and undermine its business plans, strategies, and competitive position in the marketplace.

*Second,* violations of restrictive covenants and the associated damages to business reputation and/or goodwill constitute irreparable harm as a matter of law. *Lowry,* 984 F. Supp. at 116 ("The injury will be irreparable if [Plaintiff] loses customers it has spent years and significant resources obtaining."); *Consulting Co. v. Walling,* 851 F. Supp. 839, 847 (E.D. Mich. 1994) ("Loss of customer goodwill and fair competition can support a finding of irreparable harm. Such losses often amount to irreparable injury because the resulting damages are difficult to calculate."); *Certified Restoration,* 511 F.3d at 550 ("The likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate").

Zeigler has spent years establishing its goodwill with both advertisers and customers in the automobile dealership and Chevrolet automobile sales industry in the northern Chicago suburbs. Similarly, because Zeigler's employees are critical to Zeigler's success and competitive advantage in the marketplace, Zeigler has also spent substantial resources in attracting, training, and retaining competent employees and developing goodwill with its employees. Consequently, direct competition from Chavez, who learned the substance of all of Zeigler's confidential information and has disclosed some of Zeigler's confidential information to a direct competitor, and Chavez poaching or attempting to poach Zeigler employees, has led and will continue to lead to irreparable harm.

14

### C.    Zeigler Lacks An Adequate Remedy At Law.

A plaintiff lacks an adequate remedy at law, if its injury is not fully compensable by money damages. *See Certified Restoration*, 511 F.3d at 550. Likewise, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate. *Id.* As the Sixth Circuit has explained,

> The likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate. The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer.

*Id.* (citation omitted).

Preliminary injunctive relief is necessary against Defendants because Zeigler's injury is not fully compensable through money damages, and money damages would be difficult to calculate. Zeigler has no meaningful legal remedy to prevent Defendants from inflicting this harm upon Zeigler. Further, Chavez specifically agreed that if he breaches the Agreement, money damages "will be difficult to ascertain and not easily proven following such breach." (Dkt. No. 1, Ex. 1 at § 5.) And even if Zeigler were awarded liquidated damages under the Agreement, those liquidated damages are insufficient to make Zeigler whole for the loss of its goodwill, its relationships with customers and advertisers, and its confidential information from which it derives a competitive advantage in the marketplace.

### D.    There Will Be No Harm To The Public Interest If The Injunction Issues.

A preliminary injunction will serve the public interest. Zeigler seeks to enforce restrictions on Chavez's post-employment activities that are reasonable in purpose, scope, and duration in order to protect its confidential information, reputation, goodwill, customer relationships, vendor

relationships, sales, advertising, and marketing strategies, and competitive advantage. There is no evidence that issuance of a preliminary injunction would in any way harm the public.

**E.     The Balance Of Hardships Strongly Weighs In Favor Of Entering A Preliminary Injunction.**

Finally, in addition to satisfying the four-pronged preliminary injunctive relief analysis, the balance of hardships likewise compels the issuance of the requested relief. In conducting an equitable analysis, courts look to the likely harm to each party. *Roland Machinery Co.*, 749 F.2d at 387-88; *Diginet, Inc. v. Western Union ATS, Inc*, 958 F.2d 1388, 1392-93 (7th Cir. 1992). Zeigler has suffered and will continue to suffer irreparable harm if Chavez is permitted to work for Stasek Chevrolet in violation of the Agreement, to poach Zeigler employees in violation of the Agreement, and to disclose Zeigler's confidential information to Stasek Chevrolet. In contrast, Defendants will suffer no undue hardship if injunctive relief is granted because the preliminary injunction would only restrain Defendants from engaging in activities that violate the Agreement.

## CONCLUSION

For all the foregoing reasons, Zeigler respectfully requests that the Court grant the preliminary injunctive relief requested against Defendants as set forth in Zeigler's Motion.

Respectfully submitted,

**ZEIGLER AUTO GROUP II, INC.** and
**ZEIGLER CHEVROLET –**
**SCHAUMBURG, LLC**


By:/s/ Michael J. Grant
     One of Their Attorneys

16

## <u>CERTIFICATE OF SERVICE</u>

I certify that today, May 14, 2019, I electronically filed the foregoing **Plaintiffs'**
**Memorandum In Support Of Their Motion For Entry Of A Preliminary Injunction** using
this Court's ECF system.  Counsel of record for all parties will be served by this Court's ECF
system.


By:  /s/ Michael J. Grant

17