**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ZEIGLER AUTO GROUP II, INC., a Michigan
corporation, and ZEIGLER CHEVROLET –
SCHAUMBURG, LLC, a Michigan limited
liability company,

|                                               |                        |
| --------------------------------------------- | ---------------------- |
| Plaintiffs                                    | Case No. 19-cv-02748   |
| v.                                            |                        |
| HORACIO CHAVEZ a/k/a JOSE CHAVEZ, and         |                        |
| BILL STASEK CHEVROLET, INC., an Illinois      |                        |
| corporation,                                  |                        |
| Defendants.                                   |                        |

**DEFENDANTS' MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Bethany N. Schols
**HARDT, STERN & KAYNE, P.C.**
2610 Lake Cook Road, Suite 200
Riverwoods, IL 60015
bschols@hsklaw.com
847-597-2150

*Counsel for Horacio Chavez a/k/a Jose Chavez and
Bill Stasek Chevrolet, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………… ii

I.  INTRODUCTION…………………………………………………………… 1

II.  STATEMENT OF FACTS......……………………….·…........................... 2

    A.  The Parties…..…………………………………………………….….. 2

    B.  Mr. Chavez's Employment at Zeigler Chevrolet……………………… 2

    C.  The Agreement……………………………………………..………… 3

    D.  Mr. Chavez's Employment with Stasek……..…………………………….... 4

    E.  The Lawsuit…………………………………..……………………. 5

        1.  Non-Compete……………………………………...……………… 5

        2.  Non-Raid…………………………………………………… 6

        3.  Confidential Information………………………………………… 8

III.  OBJECTION TO ZEIGLER'S DECLARATION AND AFFIDAVIT…………… 8

IV.  PRELIMINARY INJUNCTION STANDARD…………………………… 9

V.  ARGUMENT……………………………………………………………… 10

    A.  Plaintiffs Do Not Have a Reasonable Likelihood of Success on the Merits
    of their Claims against Defendants…..………….……………………………. 10

        1.  The Agreement Is Unenforceable…………………………………... 10

        2.  Mr. Chavez Did Not Breach the Agreement's Non-Compete Provision.... 14

        3.  Mr. Chavez Did Not Breach the Agreement's Non-Raid Provision……... 15

        4.  Mr. Chavez Did Not Breach the Agreement's Confidentiality
        Provision… 16

        5.  Stasek Chevrolet Did Not Interfere with the Agreement………………… 17

        6.  The Agreement Does Not Provide for Recovery of Attorneys' Fees……. 18

    B.  Plaintiffs Will Not Suffer Irreparable Harm without the Preliminary
    Injunctive Relief………………….……….……………………………… 18

    C.  Plaintiffs Have an Adequate Remedy at Law…..…………………………... 20

    D.  The Balance of Harms Weighs in Favor of the Defendants…………………... 20

TABLE OF CONTENTS OF EXHIBITS………………………………………………… 22

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Abrasic 90 Inc. v. Weldcote Metals, Inc.,* 364 F. Supp. 3d 888 (N.D. Ill. 2019)...................19

*Alarm Detection Sys. v. Vill. of Schaumburg,* No. 17 C 2153, 2017 U.S. Dist.
    LEXIS 141572 (N.D. Ill. Aug. 31, 2017) ....................................................8

*Axion RMS, Ltd. v. Booth,* 2019 IL App (1st) 180724.............................................11

*Barbecue Marx, Inc. v. 551 Odgen, Inc.,* 235 F.3d 1041 (7th Cir. 2000)...............................9

*Bishop v. Lakeland Animal Hosp., P.C.,* 644 N.E.2d 33 (Ill. App. 2nd 1994) .....................12

*Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC,* 931
    N.E.2d 780 (Ill. App. 1st Dist. 2010)..............................................18

*BRK Brands, Inc. v. Nest Labs, Inc.,* 28 F. Supp. 3d 765 (N.D. Ill. 2014) ...........................19, 20

*Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.,* 879 N.E.2d 512 (Ill. App.
    1st Dist. 2007)....................................................................14

*Coates v. Bastian Bros, Inc.,* 741 N.W.2d 539 (Mich. App. 2007) ......................................11, 13

*DR Distribs., LLC v. 21 Century Smoking, Inc.,* 2013 U.S. Dist. LEXIS 36315
    (N.D. Ill. 2013)....................................................................18, 19

*Fleet Bus. Credit, LLC v. Krapohl Ford Lincoln Mercury Co.,* 735 N.W.2d 644
    (Ct. App. Mich. 2007).............................................................18

*Fleetwood Packaging v. Hein,* 2014 U.S. Dist. LEXIS 172540 (N.D. Ill. Dec. 15,
    2014) .............................................................................14

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.,*
    549 F.3d 1079 (7th Cir. 2008) ...................................................9, 10

*Granite Buick GMC, Inc. v. Ray,* 872 N.W.2d 810 (S.D. 2015)...........................................14

*Green River Bottling Co. v. Green River Corp.,* 997 F.2d 359 (7th Cir. 1993)...................10

*Instant Tech. LLC v. DeFazio,* 793 F.3d 748 (7th Cir. 2015).................................................11, 12, 13

*Integrated Genomics, Inc. v. Kyrpides,* 2010 WL 2697604 (N.D. Ill. Jan. 20,
    2010) .............................................................................11

*Kelsey-Hayes Co., v. Maleki,* 765 F. Supp. 402 (E.D. Mich. 1991) .....................................12

*Leon M. Reimer & Co., P.C. v. Cipolla,* 929 F. Supp. 154 (S.D.N.Y. 1996).......................15

*Lowry Computer Prds. v. Head,* 984 F. Supp. 1111 (E.D. Mich. 1997) ..............................16

*North Atl. Instruments, Inc. v. Haber,* 188 F.3d 38 (2nd Cir. 1999)....................................20

*Oxford Glob. Res., LLC v. OnPoint Healthcare Sols., Inc.*, No. 18-cv-0425-WQH-
    BLM, 2018 U.S. Dist. LEXIS 109450 (S.D. Cal. June 29, 2018) .............................9

*Radio One, Inc. v. Wooten,* 452 F. Supp. 2d 754 (E.D. Mich. 2006) ................................11, 12, 13

*Reliable Fire Equip. v. Arredondo,* 965 N.E.2d 393 (Ill. 2011) ...........................................11

*Robert Half Int'l, Inc. v. Van Steenis,* 784 F. Supp. 1263 (E.D. Mich. 1991) ......................11

*Triumph Packaging Group v. Ward,* 834 F. Supp. 2d 796 (N.D. Ill. 2011) ........................11

*Turnell v. Centimark Corp.,* 796 F.3d 656 (7th Cir. 2015)....................................................9

*Valencia v. City of Springfield,* 883 F.3d 959 (7th Cir. 2018)..............................................9, 10

*Winter v. National Resources Defense Council,* 555 U.S. 7 (2008) ....................................9

**Statutes**                                                                                    **Page(s)**

Michigan Comp. Laws § 445.774a(1) ................................................................................11, 14

## I.    INTRODUCTION

Defendant, Jose Chavez, was the General Manager ("GM") of Zeigler Chevrolet-Schaumburg, LLC ("Zeigler Chevrolet"). He had an employment agreement which, if enforceable, stated that, upon leaving Zeigler Chevrolet, he could not work at any business that sold new or used cars in an area stretching east and west from Lansing, Michigan to Rockford, Illinois, and north and south from Milwaukee, Wisconsin to Kankakee, Illinois[1]. He quit. He talked to Aaron Zeigler, President of Zeigler Auto Group II, Inc. ("Zeigler Auto") (Zeigler Auto and Zeigler Chevrolet collectively, "Zeigler"). Mr. Zeigler encouraged Mr. Chavez to take the GM position at Bill Stasek Chevrolet, Inc. ("Stasek Chevrolet"). Mr. Chavez took the job.

A couple months later, Dimitrios Maravelas left Zeigler Chevrolet when he believed he was about to be fired. He came to work for Stasek Chevrolet.

Now, Zeigler claims Mr. Zeigler forbade Mr. Chavez from working at Stasek Chevrolet. They claim that Mr. Chavez breached the non-compete, the non-raid and the confidentiality provisions of the agreement, and that Stasek Chevrolet tortiously interfered with the agreement.

On its face, the agreement is unenforceable. Moreover, Zeigler consented to Mr. Chavez working at Stasek Chevrolet. Mr. Chavez didn't raid any employees. Mr. Maravelas came to Stasek Chevrolet independent of any actions of Mr. Chavez. Finally, Mr. Chavez never divulged any of Zeigler Chevrolet's confidential information. There was no tortious interference, as there was no breach.

Plaintiffs' Motion for Entry of a Preliminary Injunction ("Motion") should be denied.

---

[1] As the crow flies, Lansing to Rockford is 233.334 miles, and Milwaukee to Kankakee is 132.691 miles for a total of 30,961.321 square miles, an area twice the size of Switzerland or nearly equal to the Country of Ireland. See www.freetoolmaps.com/how-far-is-it-between.htm.

## II.    STATEMENT OF FACTS

### A.    The Parties.

Zeigler Auto owns 23 automobile dealerships located in Illinois, Indiana, Michigan and New York, as well as three finance companies, a parts franchise, a leasing firm and insurance firms. www.zeigler.com/the-history-of-zeigler.htm. One of its many dealerships is Zeigler Chevrolet, in Schaumburg, Illinois, which opened in 2010. (Doc. #17-1 p. 2 ¶3.) Mr. Zeigler is President of Zeigler Auto. (Doc. #17-1 p. 3 ¶¶5, 6.) Joe St. Germain is the Vice President of Zeigler Chevrolet. (Doc. #17-2 p. 2 ¶3.)

Stasek Chevrolet owns a lone automobile dealership in Wheeling, Illinois. (Ex. 1 ¶ 6.) Stasek Chevrolet, started by Bill Stasek, has been operating in the same location for decades. (Ex. 1¶ 5.) When Mr. Stasek died in March, 2018, ownership of the dealership passed to his widow, Linda Stasek, now President of Stasek Chevrolet. (Ex. 1¶¶7, 8.) Today, her son, Jeremy Stasek, serves as Vice President of Operations. (Ex. 2 ¶3.)

Mr. Chavez has worked in the automobile business in Illinois for almost 14 years. (Ex. 3 ¶7.) He has worked for five different dealerships, working his way up from Finance Director to GM. (Id. ¶8.) He is married, has a 2 year-old and a baby due later this year. (Id. ¶¶3-4.) His wife, Anahi, is a tenured Chicago Public School teacher, who elected to take leave from her job when she had their eldest child and has not been back to work since. (Id. 3 ¶5.) The Chavez family lives in Mount Prospect, Illinois. (Id. 3 ¶6.)

Dimitrios Maravelas is the used car manager at Stasek Chevrolet. (Ex. 4 ¶19.) He is married to Amanda Maravelas, who also works in the car business. (Ex. 5 ¶¶3-5.)

### B.    Mr. Chavez's Employment at Zeigler Chevrolet.

In 2017, Mr. Chavez was the General Sales Manager for Sherman Dodge. (Ex. 3 ¶9.) He

did not have a non-compete agreement. (Id. ¶10.) Mr. Zeigler contacted Mr. Chavez, recruited him and actively encouraged him to leave Sherman Dodge. (Id. ¶11.) On August 16, 2017, Mr. Chavez became the GM of Zeigler Chevrolet. (Id. ¶13.)

As GM, Mr. Chavez worked open to close, six days a week, and reported directly to Mr. St. Germain. (Ex. 3 ¶18.) Victor Malkon, as General Sales Manager, reported to Mr. Chavez. (Id. ¶19.) Mr. Maravelas, as Used Car Manager, reported to Mr. Malkon. (Id. ¶36.) As GM, Mr. Chavez had little personal customer interaction, and had the same access to the sales database as all of the managers, including Mr. Maravelas and Mr. Malkon. (Id. ¶¶26-27.)

Shortly after he began, Mr. Chavez was asked to join the so-called "Performance Group", which was overseen by Zeigler Auto's Director of Talent Development. (Ex. 3 ¶20.) This Group was a 10-member leadership development, mentorship program. (Id. ¶21.) No Zeigler Auto executives, not even Mr. St. Germain, were members. (Id. ¶22.) Mr. Chavez was asked to agree to and sign the Performance Group Business Protection Agreement, but never did. (Id. ¶¶23-24.) Nevertheless, Mr. Chavez did, however, participate in the Performance Group for a year. (Id. ¶25.)

### C. The Agreement.

Mr. Chavez started working at Zeigler Chevrolet on August 16, 2017, but Mr. St. Germain did not present Mr. Chavez with the Non-Compete & Non-Solicitation Agreement ("Agreement") until around November of 2017. (Ex. 3 ¶¶16-17.) Although he did sign it, Mr. Chavez received no additional pay or benefit of any kind in return for signing the Agreement. (Id. ¶13.) The Agreement includes the following non-compete provisions:

> 1. Duration: For a period of 24 months following the effective date of termination of Mr. Chavez's employment.

2. Scope: Mr. Chavez cannot "directly or indirectly represent or be employed by a Competitor of [Zeigler]." A Competitor of [Zeigler] is defined as any "automobile dealership or new or used vehicle dealership related entity."

3. Geographic Limitations: Mr. Chavez cannot work for a "Competitor of [Zeigler] within fifty (50) miles of any of the Company's locations."

(Doc. #1-1 at p. 2 ¶1.) In addition, the Agreement prohibits Mr. Chavez from utilizing or disclosing Zeigler's confidential information and contains a non-raid provision as follows:

Employee understands and agrees that, upon termination of his employment with the Company, whether voluntary or involuntary, he will not induce or influence or attempt to induce or influence any employee of the Company to terminate employment with the Company, or advise or recommend to any other person, firm, partnership, individual, corporation or any other entity that it employ, or solicit for employment, any person who is an employee of the Company.

(Id. at p. 2 ¶¶3, 4.) The Agreement contains no provision authorizing or acknowledging the need for or right to injunctive relief. Rather, it only contains a liquidated damages clause of $125,000 for breach of the Agreement, and required Mr. Chavez to "indemnify and compensate [Zeigler] for any expenditures [Zeigler] incurs as a result of enforcing this agreement, including but not limited to, any costs related to posting a bond or other related expenditures." (Id. at pp. 2-3, ¶¶5, 7.) Finally, the Agreement states that it is to be construed, interpreted and enforced in accordance to the laws of the "State of Michigan, County of Kalamazoo." (Id. at p. 3 ¶8.)

**D.    Mr. Chavez's Employment with Stasek Chevrolet.**

On January 28, 2019, Mr. Chavez resigned from Zeigler Chevrolet. (Ex. 3 ¶14.) Although he did not have another job lined up, Mr. Chavez had relationships with many local dealerships,

was actively recruited by many and interviewed with several. (Id. ¶¶48-51.)

On or about January 31, 2019, Jeremy and Linda Stasek were told by Chevrolet employees assigned to Stasek Chevrolet's zone that Mr. Chavez was a "free agent", "available" and would be a good fit for Stasek. (Ex. 1 ¶12; Ex. 2 ¶8.) Mr. Stasek immediately reached out to Mr. Chavez. (Ex. 3 ¶52.) Stasek Chevrolet became one of the dealerships vying for Mr. Chavez.

Mr. Chavez told the Staseks that he had a non-compete and confidentiality agreement, but that Mr. Zeigler agreed to Mr. Chavez working at Stasek Chevrolet. (Ex. 1 ¶14; Ex. 2 ¶13.) Thus, on February 18, 2019, Mr. Chavez became Stasek Chevrolet's GM. (Ex. 3 ¶55.) It was close to home, ideal for long work hours and little kids, and a smaller dealership with potential. (Id. ¶53.)

In April 2019, Stasek Chevrolet and Mr. Chavez each received a cease and desist letter from Zeigler's counsel. (Doc. #1-3, #1-4.) In response, Defendants explained the circumstances surrounding Mr. Chavez's and Mr. Maravelas' hiring. (Ex. 1 ¶17.)

### E. The Lawsuit.

On April 23, 2019, Zeigler filed the Complaint for Injunctive Relief and Damages seeking, among other things, to prevent Mr. Chavez from working for Stasek Chevrolet, compensatory and punitive damages, prejudgment interest, and attorneys' fees from Mr. Chavez and Stasek Chevrolet. (Doc. #1.)

#### 1. Non-Compete.

Zeigler alleges that the Agreement was necessary because it "was necessary to provide Mr. Chavez with access to highly sensitive and confidential information" as GM and as a member of the Performance Group. (Doc. #1 ¶34.)

Yet, not all GMs were required to sign the Agreement before getting access to such information. (Ex. 6 ⁋19; Ex. 7 ⁋⁋4-5.) For example, Victor Malkon, the GM of Zeigler Chevrolet from February 2019 until his resignation in April 2019, was never asked to sign the Agreement or any agreement. (Ex. 6 ⁋19.) In April 2019, Mr. Malkon began working at Patrick Hyundai, in Schaumburg, Illinois, a direct competitor of Zeigler. (Ex. 6 ⁋18.) Similarly, Craig Andrea, the GM of Zeigler Buick GMC of Lincolnwood beginning in February 2018, was not asked to sign the Agreement until August 2018. (Ex. 7 ⁋⁋4-5.) The next month, Zeigler terminated him. (Ex. 7 ⁋7.) Shortly thereafter, Mr. Andrea began working as the GM of Woodfield Nissan in Schaumburg, a direct competitor of Zeigler. (Ex. 7 ⁋8.)

Zeigler alleges that Mr. Zeigler told Mr. Chavez that Zeigler "would not consent to Mr. Chavez working at Stasek Chevrolet." (Doc. #1 ⁋44; Doc. #17 p. 10.) But he did. (Ex. 10.)

On February 15, 2019, Mr. Zeigler encouraged Mr. Chavez to work at Stasek Chevrolet and, saying it was a good opportunity for him. (Ex. 10 at 0:01, 1:26; Ex. 3 ⁋⁋22-26; Ex. 8 Decl. ⁋⁋4-7.) Mr. Zeigler told Mr. Chavez, "I'm not going to do anything about preventing you from working" at Stasek Chevrolet. (Ex. 10 at 0:00.) He continued, "We'll trade cars with ya, we'll have a great relationship, stuff like that. Anything we can do to help you going forward, you know, we'll do." (Ex. 10 at 0:50, 1:26.) Mr. Zeigler then said, "Hopefully you'll take a bunch of things that you learned from us and apply them there and do well." (Ex. 10 at 2:00.)

## 2. Non-Raid.

Zeigler alleges that Mr. Chavez "induced or influenced Maravelas to resign his employment at Zeigler Chevrolet and to begin working for Stasek Chevrolet as its used car

manager." (Doc. #1 ¶51[2].)

The fact is that Mr. Chavez did not encourage or entice Mr. Maravelas to terminate his employment with Zeigler. (Ex. 4 ¶¶20, 21; Ex. 3 ¶¶14-15.) Beginning in 2017 and continuing through January, 2019, Mr. St. Germain told Mr. Chavez to terminate Mr. Maravelas or to find a replacement for him. (Ex. 3 ¶¶8-10.) Mr. Chavez told Mr. Maravelas about those conversations. (Ex. 4 ¶¶6, 7, 12, 13; Ex. 3 ¶¶10-13.) Mr. Chavez quit in January, 2019. Then, between February, 2019 and April, 2019, Mr. St. Germain told Mr. Malkon to terminate Mr. Maravelas or find a replacement for him.  (Ex. 6 ¶¶10-12.) Mr. Malkon told Maravelas about those conversations. (Ex. 4 ¶¶6, 7, 12, 13; Ex. 6 ¶14.) Mr. Malkon quit Zeigler Chevrolet on April 12, 2019. Mr. Maravelas left Zeigler when there was no one left there to protect his job. (Ex. 4 ¶16.) Mr. Maravelas went to Stasek Chevrolet because of the years-long personal and business relationship he and his wife had with Mr. Stasek. (Ex. 4 ¶22.) Mrs. Maravelas, who is also in the car business and who works extensively with Stasek Chevrolet as an auction representative, had been talking with Mr. Stasek for months, long before Mr. Chavez worked at Stasek Chevrolet, to get Mr. Maravelas on board. (Ex. 5 ¶¶6-14; Ex. 2 ¶¶16-25.)

Zeigler alleges, without evidence, that "[Mr.] Chavez has contacted other Zeigler Chevrolet employees to induce them to resign from Zeigler and join Stasek Chevrolet in violation of his obligations under the Agreement." (Doc. #1 ¶54.)

Mr. Chavez has not encouraged or enticed any Zeigler Chevrolet employees to quit their jobs or to come work for Stasek Chevrolet. Rather, the evidence shows that other current and former Zeigler employees have reached out to Mr. Chavez for employment and he has refused to

---

[2] Defendants object to the admissibility of the "on information and belief" statements from the Declaration of Aaron Zeigler and the Affidavit of Joe St. Germain, which are the sole bases of support for this allegation. (Doc. #17-1 p. 6 ¶30; Doc. #17-2 p. 5 ¶19.)

even consider hiring them (Ex. 6 ¶¶20-21; Ex. 3 ¶¶16-18.) The only two former Zeigler employees hired by Stasek between January, 2019 and today are Mr. Maravelas and Mr. Chavez. (Ex. 3 ¶19; Ex. 2 ¶15.)

### 3. Confidential Information.

Zeigler alleges that in April, 2019, "a Stasek Chevrolet employee acting at [Mr.] Chavez' direction contacted Zeigler's representative at the Daily Herald…and requested…the same preferred advertising rate as Zeigler" and that the Daily Herald refused to give Stasek Chevrolet the same rate[3]. (Doc. #1 ¶¶62-64.)

Stasek Chevrolet uses Pinnacle for its advertising and marketing campaigns. (Ex. 9 ¶5.) Pinnacle suggested advertising in the Daily Herald before Mr. Chavez became the GM. (Ex. 9 ¶11.) Thereafter, when the issue was discussed with Mr. Chavez present, Mr. Chavez stated that he could not be involved in the decision to advertise in the Daily Herald. (Ex. 9 ¶¶12-14; Ex. 3 ¶33.) Pinnacle contacted the Daily Herald. (Ex. 9 ¶¶17-21, 24-25; Ex. 3 ¶31.) Mr. Chavez never shared Zeigler's Daily Herald pricing or any other confidential information with anyone. (Ex. 9 ¶16; Ex. 3 ¶¶32, 35.)

## III. OBJECTION TO ZEIGLER'S AFFIDAVITS

While supporting affidavits may provide the basis for a preliminary injunction, "if the facts so appearing consist largely of general assertions which are substantially controverted by counter-affidavits, a court should not grant such relief unless the moving party makes a further showing sufficient to demonstrate that he will probably succeed on the merits." *Alarm Detection Sys. v. Vill. of Schaumburg*, No. 17 C 2153, 2017 U.S. Dist. LEXIS 141572, at *4 (N.D. Ill. Aug.

---

[3] Defendants object to the admissibility of the "on information and belief" statements from the Affidavit of Joe St. Germain, which are the sole bases of support for this allegation. (Doc. #17-2 p. 6 ¶¶27-30.)

31, 2017) (internal citation omitted). Further, when the "primary evidence introduced is an affidavit made on information and belief rather than on personal knowledge, it generally is considered insufficient to support a motion for a preliminary injunction." *Oxford Glob. Res., LLC v. OnPoint Healthcare Sols., Inc.*, No. 18-cv-0425-WQH-BLM, 2018 U.S. Dist. LEXIS 109450, at *13 (S.D. Cal. June 29, 2018), quoting A Charles Alan Wright, et al., Federal Practice and Procedure § 2949 (3d ed.) (April 2018 update).

Here, paragraph 30 of the Declaration of Aaron Zeigler and Paragraphs 19, 21, 27-30 of the Affidavit of Joe St. Germain are all made "on information and belief", do not set forth personal knowledge, contain no foundation and constitute hearsay within hearsay. (Doc. #17-1; Doc. #17-2.) These are insufficient to support the Motion, and should be stricken.

## IV.    PRELIMINARY INJUNCTION STANDARD[4]

"A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.,* 555 U.S. 7, 22 (2008). It is an exercise of "very far-reaching power," a "very serious remedy…never to be indulged in except in a case clearly demanding it." *Valencia v. City of Springfield,* 883 F.3d 959, 965 (7th Cir. 2018), *Barbecue Marx, Inc. v. 551 Odgen, Inc.,* 235 F.3d 1041, 1044 (7th Cir. 2000) (internal quotation and citation omitted). Injunctive relief is never awarded as of right, but rather, only if the situation warrants such a remedy. *Valencia,* 883 F.3d at 965.

To determine whether a given situation warrants such a drastic remedy, "a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Valencia,* 883 F.3d at 966, *citing* **Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.,** 549 F.3d 1079, 1085-86 (7th Cir. 2008). In the threshold phase, a

---

[4] As this Court sits in diversity, federal procedural law and state substantive law applies. *Turnell v. Centimark Corp.,* 796 F.3d 656, 661 (7th Cir. 2015).

party must show that (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.* at 1086.

If the movant satisfies each of the three threshold requirements, then the court "proceeds to the balancing phase of the analysis," where the "court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts,* 549 F.3d at 1086. The situation here does not come close to warranting such a drastic remedy.

## V. ARGUMENT

### A. Plaintiffs Do Not Have a Reasonable Likelihood of Success on the Merits of their Claims Against Defendants.

While Plaintiffs must only show that their chances to succeed on their claims are "better than negligible," that doesn't mean that a movant with a "relatively weak case" will get an injunction. *Valencia,* 883 F.3d at 966. "If it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms." *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993). Zeigler has no case on the merits.

### 1. The Agreement is Unenforceable.

As an initial matter, the Agreement has a choice of law provision, designating "law of the State of Michigan, County of Kalamazoo." The County of Kalamazoo has no ordinances relating to employment contracts between private parties. Thus, as drafted by Zeigler, there is no operative choice of law provision, and Illinois law applies. Assuming, the "County of Kalamazoo" is read out, then Michigan law is "chosen". But, the lawsuit was filed in Illinois,

Zeigler Chevrolet is located in Illinois, Zeigler has conceded the scope of the prohibition can only be Illinois, and Mr. Chavez is and was a resident of Illinois and was employed in Illinois. To determine whether the substantive law of Illinois or Michigan applies, the Court will apply Illinois choice of law analysis.

Here, Michigan law should not apply. Illinois clearly has a greater interest in the dispute, and the Agreement violates Illinois public policy in two ways. *See Integrated Genomics, Inc. v. Kyrpides,* 2010 WL 2697604 (N.D. Ill. Jan. 20, 2010). First, Illinois courts have rejected "blue penciling" which Michigan allows and Zeigler attempts to use. *Compare, Fleetwood Packaging v. Hein,* 2014 U.S. Dist. LEXIS 172540, at *29-30 (N.D. Ill. Dec. 15, 2014) and MCLS § 445.774a. Second, Illinois law requires additional consideration for a non-compete signed after employment, especially where the employment lasts for less than two years. *Axion RMS, Ltd. v. Booth,* 2019 IL App (1st) 180724 ¶¶21-23. It is a bright line test. *Id.* Michigan doesn't. *Robert Half Int'l, Inc. v. Van Steenis,* 784 F. Supp. 1263, 1273 (E.D. Mich. 1991). Under Illinois law, the Agreement is not enforceable. Period.

Furthermore, noncompetition agreements are "disfavored as restraints on commerce." *Coates v. Bastian Bros, Inc.,* 741 N.W.2d 539 (Mich. App. 2007); *Reliable Fire Equip. v. Arredondo,* 965 N.E.2d 393, 396 (Ill. 2011). An employer may have an employee sign an agreement containing a non-compete provision, but the agreement must serve to protect an employer's "reasonable competitive business interests" or the "legitimate interests of the protected party". MCLS § 445.774a, *Triumph Packaging Grp. v. Ward,* 834 F. Supp. 2d 796, 814 (N.D. Ill. 2011). But, such an agreement cannot merely be an instrument to prevent or control competition. *Radio One, Inc. v. Wooten,* 452 F. Supp. 2d 754, 757 (E.D. Mich. 2006); *Instant Tech. LLC v. DeFazio,* 793 F.3d 748, 750 (7th Cir. 2015). It must, instead, "prevent the employee

from gaining an unfair advantage in competition with the employer." *Radio One,* 452 F. Supp.2d at 757. And, it is construed strictly against the interest of the drafter. *Kelsey-Hayes Co., v. Maleki,* 765 F. Supp. 402, 404 (E.D. Mich. 1991), vacated pursuant to settlement, 889 F. Supp. 1583. *See also, Bishop v. Lakeland Animal Hosp., P.C.,* 644 N.E.2d 33, 36 (Ill. App. 2nd 1994).

Here, the Agreement does not serve to protect reasonable competitive business interests; it just prevents competition. Zeigler claims that the Agreement was required because it was necessary to provide Mr. Chavez with confidential information to carry out his duties as Zeigler Chevrolet's GM and as a member of the Performance Group. (Doc. #17 p. 8.) But, the facts are otherwise.

- Not all Zeigler GMs had non-compete agreements. Mr. Malkon never had one.

- Zeigler does not require GMs to execute non-compete agreements immediately upon hiring. Mr. Chavez was employed for 3 months without one and Mr. Andrea was employed for six months without one.

- Zeigler has a separate agreement for the Performance Group than it does for the GMs.

- Employees can still attend the Performance Group meetings without signing the Performance Group agreement. Mr. Chavez never signed the Performance Group agreement.

- Zeigler picks and chooses when to enforce non-compete agreements. Mr. Andrea is employed at a dealership within 50 miles of Zeigler. He hasn't been sued. In addition, Mr. Zeigler told Mr. Chavez that he was not going to stop Mr. Chavez from working at Stasek Chevrolet.

Moreover, the duration, scope and geographic prohibitions of the Agreement indicate that it is not meant to protect reasonable business interests, but rather to keep the targeted employee from any employment in the car business. *Radio One,* 452 F. Supp.2d at 757; *Instant Tech.,* 793 F.3d at 750. It does not just prohibit an employee from working at the same franchise or same type of dealership. Rather, it prohibits employment in "any automobile dealership or new or used vehicle dealership related entity". And, it prohibits such employment within 50 miles of every

Zeigler dealership location, from Milwaukee, Wisconsin to Kankakee, Illinois, from Rockford, Illinois to Lansing, Michigan. And, it does so for a period of 2 years.

Zeigler seems to have conceded that the geographic provisions as expressly written are not reasonable, and are only seeking to enforce the non-compete within 50 miles of Zeigler Chevrolet – the Schaumburg location. (Doc. #10.) But, that is not what the Agreement states, and it is to be construed as written, not as one party wishes it had been written. Beyond the legal flaw in their sleight of hand, Zeigler is still wrong. In support of the reasonableness of this provision, as rewritten by Zeigler, Zeigler points to *Coates,* 741 N.W.2d 539, where a 100 miles prohibition was upheld for a year. But, that case involved a graphic communications and advertising firm and that court found the agreement reasonable given its limited temporal scope (one year), its modest geographic scope (100 miles), and plaintiff's length of employment (22 years). *Id.* at 546.

Selling cars is different. This is not a specialized industry requiring wide-spread protection, or one where an employer builds relationships with customers enough to justify restricting employees' right to work. *E.g., Instant Tech.,* 793 F.3d at 751; *Radio One,* 452 F. Supp.2d at 757 (75 mile restriction for a radio personality); *Lowry Computer Prds. v. Head,* 984 F. Supp. 1111, 1116 (E.D. Mich. 1997)(Restriction applied only to the sale of barcode systems, "only a small part of the market for computer software and products"). Rather, within just 12.2 miles of Schaumburg, Illinois, where Zeigler Chevrolet operates, there are 10 Chevrolet franchise dealerships and over 80 entities which sell cars, new or used. Prohibiting Mr. Chavez from working at any of these dealerships for two years, does not protect a legitimate business interest – it just prevents him from working.

While Michigan law expressly provides a court with discretion to "blue pencil," to "limit the agreement to render it reasonable in light of the circumstances in which it was made and

specifically enforce the agreement as limited," it does not require a court to do so. MCLS 445.774a. Illinois courts take a dim view of "blue penciling." *See e.g. Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.,* 879 N.E.2d 512, 529 (Ill. App. 1st Dist. 2007)(reforming "selective, problematic language" would give "employers an incentive to draft restrictive covenants as broad as possible" relying on courts to "automatically amend and enforce the covenant"). This Court should not endorse Zeigler's entreaty to save it from the contract it wrote. But, even if the Court is inclined to take out the Blue Pencil, the proposed modification s much more than a "slight" modification the doctrine allows. *See Fleetwood Packaging v. Hein,* 2014 U.S.Dist. Lexis 172540 (N.D. Ill. Dec. 14, 2014) at *29. This Agreement is so significantly overbroad in scope, time and geography that "blue penciling" is not appropriate.

### 2. Mr. Chavez Did Not Breach the Agreements' Non-Compete Provision.

Mr. Zeigler encouraged Mr. Chavez to work at Stasek Chevrolet and indicated that it was a good opportunity for Mr. Chavez. Mr. Zeigler told Mr. Chavez that "I'm not going to do anything about preventing you from working" at Stasek Chevrolet. (Ex. 10 at 0:00.) "We'll trade cars with ya, we'll have a great relationship, stuff like that. Anything we can do to help you going forward, you know, we'll do." (Ex. 10 at 0:50.) "[H]opefully you'll take a bunch of things that you learned from us and apply them there and do well." (Ex. 10 at 2:00.) Based on that conversation, Mr. Chavez went to work for Stasek Chevrolet.

Whether waiver, or estoppel, or novation, or course of dealing, or a combination of these rules, Zeigler cannot now ask this Court to prohibit Mr. Chavez from working, when he told Mr. Chavez he wouldn't. *See Granite Buick GMC, Inc. v. Ray,* 872 N.W.2d 810, 815 (S.D. 2015) (Plaintiff relinquished his right to enforce the covenant when he responded to defendant's question of whether he would come after defendant in any way whatsoever, saying, "no, Scotty, that will never the case…This is the car business…I wish you the best of luck.")

### 3.  Mr. Chavez Did Not Breach the Agreement's Non-Raid Provision.

Assuming the Agreement is enforceable, Zeigler alleges that the hiring of Mr. Maravelas breached the non-raid provision of the Agreement. The only evidence supporting this allegation are "on information and belief" statements by Mr. Zeigler and Mr. St. Germain that "[Mr.] Chavez contacted Maravelas and encouraged him" to leave Zeigler Chevrolet and join Stasek Chevrolet." (Doc. #17-1 p. 6 ⁋30; Doc. #17-2 p. 5 ⁋19.)

While, companies have some interest in limiting employee raiding, non-raid provisions cannot be so broad as to require employers to refuse to employ persons who "voluntarily and without active solicitation" contact the company seeking employment. *See, e.g. Leon M. Reimer & Co., P.C. v. Cipolla,* 929 F. Supp. 154, 158 (S.D.N.Y. 1996) (refusing to enjoin former employees from accepting business from former clients who "voluntarily and without active solicitation" contact the former employee and seek to retain their services.)

In early 2019, Mr. Maravelas' days at Zeigler Chevrolet were numbered. For more than a year, Mr. St. Germain was trying to get rid of him. Mr. Chavez refused to fire Mr. Maravelas. But, then Mr. Chavez quit in January, 2019. Mr. Malkon, Mr. Chavez's replacement, refused to fire Mr. Maravelas. But, then Mr. Malkon quit on April 12th. There was no one else to protect Mr. Maravelas' job. Mr. Maravelas quit on April 13th. His wife had been trying to get him to go to work at Stasek Chevrolet for a long time. So, he did. Mr. Chavez did not encourage or entice Mr. Maravelas to leave Zeigler Chevrolet.

Zeigler further alleges that Mr. Chavez "has contacted other Zeigler Chevrolet employees to induce them to resign from Zeigler Chevrolet and to join Stasek Chevrolet" (Doc. #1 at ⁋54), but they do not provide any names of any employees contacted by Mr. Chavez.

This Court, on the other hand, has evidence that Mr. Chavez did not breach the provision. Mr. Malkon left Zeigler Chevrolet on April 12, 2019. Mr. Chavez did not encourage or entice

Mr. Malkon to quit. Other current and former Zeigler employees have reached out to Mr. Chavez for jobs, but he has refused to talk to any of them about working at Stasek Chevrolet. The only two former Zeigler employees hired by Stasek Chevrolet between January, 2019 and today are Mr. Maravelas and Mr. Chavez. Mr. Chavez did not breach the Agreements' non-raid provision.

### 4. Mr. Chavez Did Not Breach the Agreement's Confidentiality Provision.

Zeigler alleges that Mr. Chavez breached the Agreement by disclosing Zeigler's Daily Herald advertising rates to Stasek Chevrolet. (Doc. #17 p. 16.) But, the only support Zeigler provides is the "on information and belief" hearsay within hearsay statements of Mr. St. Germain:

> 28. On information and belief, [Mr.] Chavez directed an employee of Stasek Chevrolet to contact Zeigler's representative at the Daily Herald to try to obtain Zeigler's confidential preferred advertising rates for Stasek Chevrolet.

> 29. Zeigler's representative at the Daily Herald refused to offer Stasek Chevrolet the same confidential preferred advertising rates that it provided to Zeigler.

> 30. On information and belief, after [Mr.] Chavez learned that Zeigler's representative at the Daily Herald would not offer Stasek Chevrolet Zeigler's confidential preferred advertising rates, [Mr.] Chavez directed the Stasek Chevrolet employee to contact another representative at the Daily Herald to try to obtain Zeigler's confidential preferred advertising rates.

First, these statements are not admissible. (See *Infra.* pp. 8-9.) Second, these statements are directly controverted by the third party, Mike Eul of Pinnacle, who actually contacted the Daily Herald. Mr. Chavez did not contact the Daily Herald and did not even participate in the meeting

to discuss advertising in the Daily Herald. He expressly "recused himself" due to his former employment with Zeigler. Finally, there is no allegation of harm suffered by Zeigler. Zeigler states that Stasek Chevrolet didn't get the preferred rate and there is no allegation that the Daily Herald refused to work with Zeigler, or increased Zeigler's prices or even agreed to place a competing ad for Stasek Chevrolet. There is zero evidence of a breach or harm.

### 5.    Stasek Chevrolet Did Not Interfere with the Agreement.

Zeigler claims, again without support, that "it is customary for a general manager at an automobile dealership to enter into a restrictive covenant with the dealership" and, therefore, "Stasek Chevrolet knew or should have known that [Mr.] Chavez was barred from working for it, poaching Zeigler Chevrolet employees for it, or disclosing confidential information to it when it hired [Mr.] Chavez." (Doc. #17 pp.17-18.)

Beyond the absence of evidence to support their contention, the facts belie this statement. Mr. Malkon did not have a restrictive covenant. Mr. Andrea did not have one for six months, until the eve of his firing. Mr. Chavez didn't have one upon his hiring by Zeigler Chevrolet and does not currently have one at Stasek Chevrolet.

That being said, as Zeigler explains, in order for a claim of tortious interference against Stasek Chevrolet, Stasek Chevrolet must have *intentionally* tried to interfere with the Agreement – it must be knowing. (Doc. #17 p. 17.) Stasek Chevrolet has done everything to avoid interfering with the Agreement. For example, Stasek Chevrolet only contacted Mr. Chavez after agents of Chevrolet told Mr. Stasek and Mrs. Stasek that Mr. Chavez was a "free agent", "available" and would be a good fit for Stasek Chevrolet. Then, during the negotiations with Mr. Chavez and before Stasek hired Mr. Chavez, Mr. Chavez told Stasek Chevrolet that he had a non-compete, but that Mr. Zeigler did not object to Mr. Chavez working at Stasek and that Mr. Chavez had the conversation recorded to prove Mr. Zeigler's assent.

Furthermore, as stated above, there is no evidence that Stasek has induced or even allowed Mr. Chavez to "poach" Zeigler Chevrolet's employees. Rather, Mr. Chavez and Stasek Chevrolet were careful to guard against any potential "poaching." Mr. Chavez has been contacted by many Zeigler employees, past and present, and has refused to consider any of them for positions at Stasek Chevrolet. Finally, Stasek Chevrolet has excluded Mr. Chavez from discussions that involve matters where the confidential information he gained from working at Zeigler could be beneficial to Stasek Chevrolet.

There is zero evidence of tortious interference and zero evidence of damage therefrom.

### 6. The Agreement Does Not Provide for Recovery of Attorneys' Fees.

Under both Illinois and Michigan law, an award of attorneys' fees is contrary to common law. *Fleet Bus. Credit, LLC v. Krapohl Ford Lincoln Mercury Co.,* 735 N.W.2d 644, 647 (Ct. App. Mich. 2007); *Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC,* 931 N.E.2d 780, 798 (Ill. App. 1st Dist. 2010). Accordingly, an agreement must specifically set forth a right to attorneys' fees and will be strictly enforced as written. *Fleet Bus. Credit,* 735 N.W.2d at 647-348; *Bright Horizons,* 931 N.E.2d at 798. Here, the Agreement does not mention attorneys' fees at all. It merely states, "Employee further agrees to indemnify and compensate Employer for any expenditures the Company incurs as a result of enforcing this agreement, including, but not limited to, any costs related to posting a bond or other related expenses." (Doc. #1-1 at p. 3 ¶7.) As written, the Agreement does not entitle either party to recover attorneys' fees, regardless of which party is the prevailing party. Zeigler won't succeed on this claim either.

### B. Plaintiffs Will Not Suffer Irreparable Harm Without the Preliminary Injunctive Relief.

Injunctive relief is not about addressing past errors, rather it is only for preventing future harm. *DR Distribs., LLC v. 21 Century Smoking, Inc.,* 2013 U.S. Dist. LEXIS 36315 at *6 (N. D.

Ill. 2013). To grant injunctive relief there must be "ongoing or impending harm." *Abrasic 90 Inc. v. Weldcote Metals, Inc.,* 364 F. Supp. 3d 888, 907 (N.D. Ill. 2019). A movant has the "burden to show that it would suffer immediate and substantial irreparable harm absent the issuance of a preliminary injunction." *DR Distribs.,* 2013 U.S. Dist. LEXIS 36315 *7.

Here, the injunctive relief requested is moot with respect to the non-raid and confidentiality provisions. Regardless of the Agreement's enforceability, both Stasek Chevrolet and Mr. Chavez have agreed that they will not entice any Zeigler employee to terminate his/her employment and come work for Stasek Chevrolet. No other Zeigler employees have been hired by Stasek Chevrolet and there is no evidence that Stasek Chevrolet has attempted to hire any Zeigler employees. Similarly, regardless of the enforceability of the Agreement, and contrary to Zeigler's assertions (Doc. #17 p. 16), both Stasek Chevrolet and Mr. Chavez have agreed that Mr. Chavez will not use or disclose any confidential information he gained while employed by Zeigler. Zeigler's only claim regarding confidential information is the Daily Herald pricing. (Doc. #17 p. 16.) The evidence is uncontroverted that Mr. Chavez did not participate in Stasek Chevrolet's negotiations with the Daily Herald, Stasek Chevrolet received no benefit and Zeigler suffered no damage.

Thus, the only remaining issue is the enforcement of the non-compete provision of the Agreement – denying Mr. Chavez the ability to work in the automobile industry. Zeigler claims that "direct competition from Chavez, who learned the substance of all of Zeigler's confidential information…has led and will continue to lead to irreparable harm." (Doc. #17 p. 19.) But, this is mere speculation. *See BRK Brands, Inc. v. Nest Labs, Inc.,* 28 F. Supp. 3d 765, 770 (N.D. Ill. 2014) (J. Posner)("[W]ithout irreparable harm there's no reason to award the plaintiff any relief

before the merits of his claim are determined after a full litigation culminating in a final judgment.")

### C.    Plaintiffs Have an Adequate Remedy at Law.

Zeigler has an adequate remedy at law. Zeigler quantified its potential damages should Mr. Chavez breach the Agreement in the form of liquidated damages. The Agreement does not include an "irreparable injury" provision standard in non-compete agreements. While not dispositive, the absence of such a clause is one more reason to decline to enter the requested injunctive relief. *See North Atl. Instruments, Inc. v. Haber,* 188 F.3d 38, 49 (2nd Cir. 1999).

### D.    The Balance of Harms Weighs in Favor of the Defendants.

Under the "sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Valencia,* 883 F.3d at 966. Mr. Chavez's only vocation is selling cars. Prohibiting him from working in a car dealership for 2 years, within 50 miles of any Zeigler dealership prevents Mr. Chavez from working in an entire industry. Enforcing the non-compete provision, even if rewritten as Zeigler suggests, would prevent Mr. Chavez from earning a living in a business that requires working hours, open to close, six days a week. Mr. Chavez is the sole bread winner for his family. He, his wife, toddler and yet-to-be-born child would have to move.

As to Stasek Chevrolet, a preliminary injunction, forcing Stasek Chevrolet to terminate its GM, would cause a serious disruption in its business. Further, trying to find an interim GM, who would man the helm until this Court makes its final decision would be harmful to this single location dealership.

On the flip side, granting the preliminary injunction would probably confer little benefit on Zeigler. *See, BRK Brands, Inc.,* 28 F.Supp.3d at 771.

Dated: June 21, 2019                    By: /s/ Bethany N. Schols

Bethany N. Schols
Hardt, Stern & Kayne, P.C.
2610 Lake Cook Road, Suite 200
Riverwoods, IL 60015
Telephone: (847) 597-2150
brappaport@hsklaw.com
bschols@hsklaw.com

# EXHIBITS

| Description | Ex. |
|---|---|
| Declaration of Linda Stasek………………… | 1 |
| Declaration of Jeremy Stasek ……………… | 2 |
| Declaration of Horacio "Jose" Chavez……... | 3 |
| Declaration of Dimitrios Maravelas………... | 4 |
| Declaration of Amanda Maravelas…………. | 5 |
| Declaration of Ohanis "Victor" Malkon……. | 6 |
| Declaration of Craig Andrea……………….. | 7 |
| Declaration of Anahi Chavez……………… | 8 |
| Declaration of Michael Eul…………………. | 9 |
| Audio File | 10 |