# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ZEIGLER AUTO GROUP II, INC., a Michigan corporation, and ZEIGLER CHEVROLET – SCHAUMBBURG, LLC, a Michigan limited liability company, | |
| Plaintiffs, | Case No. 19-cv-02748 |
| | Judge John Robert Blakey |
| v. | |
| HORACIO CHAVEZ a/k/a JOSE CHAVEZ, DIMITRIOS MARAVELAS, JEREMY STASEK, and BIL STASEK CHEVROLET, INC., an Illinois corporation, | |
| Defendants. | |

## MEMORANDUM OPINION & ORDER

This case arises out of the actions of two former Zeigler Chevrolet-Schaumburg (Zeigler Chevrolet) employees who left Zeigler Chevrolet to work for competitor Bill Stasek Chevrolet, Inc. (Stasek Chevrolet). According to Plaintiffs, Defendant Horacio Chavez' employment with Stasek Chevrolet violates several restrictive covenants contained in his Non-Compete & Non-Solicitation Agreement (the Agreement). Plaintiffs also allege that Defendants Chavez and Dimitrios Maravelas misappropriated Plaintiffs' trade secrets and that Mr. Chavez solicited Mr. Maravelas to work at Stasek Chevrolet. Plaintiffs sued alleging, as relevant here, breach of contract, tortious interference with contract, and violations of the Defend

1

Trade Secrets Act and the Illinois Trade Secrets Act. [50]. Plaintiffs also filed an amended motion for preliminary injunction, which is presently before the Court. [52]. For the reasons explained below, the motion is granted in part and denied in part.

## I.  BACKGROUND

### A.  Plaintiffs' Business

Zeigler Auto Group II, Inc. (Zeigler) owns several automobile dealerships primarily located in Michigan and Illinois. [54] (Ex. 1) ¶ 5. Zeigler Chevrolet is among those dealerships. *Id.* ¶¶ 5–6.

Zeigler attributes much of its success to its secure customer relationship system, the VinSolutions system. *Id.* ¶¶ 17–23; [54] (Ex. 2) ¶¶ 10–26. This system contains information such as Zeigler customer purchase history, notes from any interaction with customers or potential customers, notes of customer purchasing habits, customer car service information, and analytic data about sources for sales leads. *Id.* ¶ 19. The VinSolutions system contains notes not only regarding Zeigler Chevrolet, but for all of Zeigler's dealerships. *Id.* Zeigler employees update this information daily and in real time. *Id.* ¶ 20. This Zeigler-specific information is not generally known to the public. *Id.* ¶ 23, (Ex. 2) ¶¶ 15–16.

Because of its value, Zeigler keeps this information confidential. [54] (Ex. 1) ¶¶ 24–30, (Ex. 2) ¶¶ 18–26. Zeigler secures its confidential information by providing employees user-specific login information and restricting the level of information a given employee may access based upon that employee's job duties. *Id.* Some employees have no access at all. [54] (Ex. 2) ¶ 20. Zeigler also requires its high-level

employees, who are given the greatest VinSolutions system access, to sign non-compete, non-solicitation, and confidentiality agreements. *Id.* ¶ 21. Finally, all Zeigler employees are also required to review, agree to, and sign the Employee Handbook, which emphasizes the importance of keeping Zeigler's business information confidential. *Id.* ¶¶ 22–23, (Ex. A).

## B.  Defendants Chavez' and Maravelas' Employment

In August 2017, Zeigler Chevrolet hired Defendant Horacio (Jose) Chavez to serve as general manager. *See also*, [54] (Ex. 1) ¶ 34; [63] (Ex. 4) ¶ 13. As Zeigler Auto President Aaron Zeigler testified, Zeigler considered Mr. Chavez a high-level employee with a variety of key responsibilities. [54] (Ex. 1) ¶¶ 34–40. In addition to serving as general manager, Mr. Chavez also participated in Zeigler's Performance Group. *Id.* ¶¶ 36–38. That group is comprised of top executives from the various Zeigler dealerships. *Id.* During its meetings, the Performance Group discusses the health of the dealerships including finances, business processes, sales, negotiating tactics, hiring practices, legal matters, and other sensitive topics. *Id.* Mr. Zeigler testified that, as a key employee, Zeigler Chevrolet required Mr. Chavez to sign the Agreement, which included non-compete, non-solicitation, and confidentiality provisions. *See also id.* ¶ 39, (Ex. B), (Ex. 2) ¶¶ 39–40. Mr. Zeigler further testified that Zeigler Chevrolet required Mr. Chavez to sign the Agreement as part of his employment and pay plan. *See also*, [72] (Ex. A) ¶ 4, (Ex. 1) at 2.

Defendant Dimitrios Maravelas is also a former Zeigler Chevrolet employee. Mr. Maravelas served as Zeigler Chevrolet's used car manager and reported directly

3

to Mr. Chavez. [54] (Ex. 1) ¶¶ 31–33, (Ex. 2) ¶¶ 27–28. In this role, Mr. Maravelas managed the used car inventory, purchased and sold cars, supervised the reconditioning of the used car inventory, marketed Zeigler Chevrolet's used cars, and worked with salespeople. [54] (Ex. 2) ¶ 28. Like all Zeigler Chevrolet employees, Mr. Maravelas signed Zeigler's Employee Handbook, which reminds employees of the importance keeping Zeigler's business information confidential. *Id*. (Ex. B). Additionally, Zeigler provided Mr. Maravelas a unique username and password to log onto the VinSolutions system. *Id*. ¶¶ 31–32. Zeigler authorized Mr. Maravelas to have full access so that he could effectively perform his job. *Id*. ¶¶ 29, 31.

## C. Defendant Chavez Resigns

This story took a sharp turn on January 28, 2019 when Mr. Chavez unexpectedly resigned. [54] (Ex. 1) ¶ 41. The day after his resignation, Mr. Chavez returned his Zeigler-issued laptop and cellphone. *Id*. (Ex. 2) ¶ 42. Upon return, even though Zeigler did not instruct him to do so, Mr. Chavez reset the settings on both devices so that his information was erased. *Id*. ¶¶ 44–45. Beyond his Zeigler laptop and cellphone, Mr. Chavez also took it upon himself to store Zeigler information on a USB flash drive. *Id*. ¶ 46. Mr. Chavez asserts that he left the flash drive in a Zeigler shred bin after resigning. [63] (Ex. 4) ¶ 44. Plaintiffs argue Mr. Chavez never returned the flash drive and may still possess it. [54] (Ex. 2) ¶ 48. Significantly, Zeigler further discovered that on the day of his resignation, and again the day after, Mr. Chavez logged onto the VinSolutions system eight times, until his access was terminated on January 29. [70] ¶ 18, (Ex. 1).

Mr. Zeigler testified that as of February 2019 Plaintiffs had not discovered Mr. Chavez' inappropriate logins to the VinSolutions system. Thus, the relationship between Plaintiffs and Mr. Chavez remained on good terms, and in mid-February 2019, Mr. Zeigler gave Mr. Chavez his blessing to work at competitor Stasek Chevrolet. [63] (Ex. 13).[1] Ostensibly referencing Mr. Chavez' non-compete clause, Mr. Zeigler also told him, "I'm not going to do anything about preventing you from working" at Stasek Chevrolet. *Id.*, (Ex. 4) ¶ 80.

## D. Defendant Chavez Recruits Defendant Maravelas

The next shoe to drop came in mid-February after Mr. Chavez accepted the general manager position at Stasek Chevrolet, which was when Mr. Chavez and Mr. Maravelas engaged in the first of many phone calls. [54] (Ex. 4) (Ex. F) at D. Maravelas 0023. Even though the Agreement prohibited Mr. Chavez from soliciting Zeigler employees, *id.* at (Ex. 1) (Ex. B at cl. 4), Mr. Chavez and Mr. Maravelas spoke on the phone, and sent text messages repeatedly from mid-February through the end of March. [54] (Ex. 4) (Exs. A, E-F). On April 2, 2019, Mr. Maravelas text messaged Mr. Stasek, "I'll quit tomorrow if that works." *Id.* at (Ex. C) at Stasek 0436, (Ex. E) at D. Maravelas 302.

Yet despite deciding to quit, Mr. Zeigler testified that Mr. Maravelas stayed at Zeigler Chevrolet for about two more weeks without informing Zeigler Chevrolet of

---

[1] Plaintiffs argue the conversation between Mr. Zeigler and Mr. Chavez remains inadmissible for the purposes of this motion, because Mr. Chavez recorded this conversation without Mr. Zeigler's knowledge and consent, which Plaintiffs believe violates Illinois law. [72] at 8; 720 ILL. COMP. STAT. 5/14–2. This argument is largely irrelevant to the motion at issue, however, as neither party disputes the proffered contents of the call or that the participants could otherwise testify about the contents of the conversation in court. *See* 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949 (3d ed. 2019).

his plans to quit and work for Stasek Chevrolet. *See also*, *id*. at (Ex. 2) ¶ 50, (Ex. E). During this two-week period, Mr. Maravelas stayed in close contact with Mr. Chavez and Mr. Jeremy Stasek, the owner of Stasek Chevrolet. *Id*. at (Ex. 4) (Exs. A, C–F). During this two-week time period, Mr. Maravelas also repeatedly logged onto Zeigler's VinSolutions system. [70] ¶ 19, (Ex. 1) (logging on more than 40 times between March 30 and April 15). Indeed, he continued to do so not only during the time period between telling Mr. Stasek he planned to quit and when he finally informed Zeigler Chevrolet on April 13, 2019, [54] (Ex. 2) (Ex. E), but also three times following his formal resignation until Zeigler terminated his access on April 15, 2019. *Id*.

### E.     Plaintiffs Suspect Further Anticompetitive Conduct

Following Mr. Maravelas' resignation, Zeigler began to suspect other improper actions when Zeigler's relationship manager contacted Zeigler's advertising partner, The Daily Herald. [54] (Ex. 2) (Ex. F). Specifically, Zeigler's relationship manager claimed that she learned that Mr. Chavez used his knowledge of Zeigler's pricing to try to obtain the same pricing for Stasek Chevrolet. *Id*. In response to this claim, however, Stasek Chevrolet's advertising and marketing campaign partner, Pinnacle, submitted a declaration denying Mr. Chavez participated in any discussions regarding the Daily Herald. [63] (Ex. 12) ¶¶ 13–16. Mr. Chavez also submitted a declaration stating that "[s]ince my employment with Zeigler ended, I never told anyone the advertising rates negotiated on behalf of Zeigler." [63] (Ex. 4) ¶ 37.

As a result of these actions, on April 23, 2019, Plaintiffs filed a complaint in this Court and, on May 3, 2019 filed a motion for preliminary injunction. [1]; [10]. Plaintiffs eventually amended both filings following expedited discovery. [50]; [52]. Plaintiffs motion for preliminary injunction moves for an order enjoining Chavez from employment with any automobile dealership or dealership related entity within 50 miles of Zeigler Chevrolet for 24 months; enjoining Defendants from disclosing or using Plaintiffs' trade secrets for 24 months; ordering Defendants to return any trade secrets; enjoining Defendants from interfering with Zeigler's relationship with customers and potential customers, and advertising partners; enjoining Defendants from soliciting Zeigler employees to terminate their employment for 24 months; ordering Defendants to produce personal storage devices for inspection; enjoining Defendants from destroying any records; and to waive the posting of bond.[2] [52].

## II. <u>Legal Standard</u>

In deciding whether a preliminary injunction should issue, this Court "engages in a two-step analysis." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008)). First, this Court considers whether Plaintiffs demonstrated that: "(1) absent preliminary injunctive relief, [they] will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) [they have] a reasonable likelihood of success on the merits." *Id.* at 661–62 (citing *Girl Scouts*, 549 F.3d at 1086; *Cooper v. Salazar*, 196 F.3d 809,

---

[2] Plaintiffs' briefing contained no argument or evidence as to why bond should be waived, so this Court declines to do so here.

813 (7th Cir. 1999)).  To demonstrate a likelihood of success on the merits, the moving parties "need not demonstrate a likelihood of absolute success," but rather must show their chances are better than negligible.  *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1129 (N.D. Ill. 2019).

If Plaintiffs make that threshold showing, then this Court adopts a sliding scale approach and weighs the harm to the moving party of not granting the preliminary injunction against the harm to the nonmoving parties (and the public) of granting the injunction.  *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 806 (N.D. Ill. 2011).  During this second phase, the more likely the plaintiff is to be successful on the merits, the less strongly the "balance of irreparable" harms need to weigh in the plaintiff's favor.  *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).

Given the early stage in litigation and the immediate nature of a motion for preliminary injunction, the law permits this Court to consider evidence it would not otherwise consider at trial or on a motion for summary judgment.  *See S.E.C. v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991); 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949 (3d ed. 2019).

### III.  <u>Analysis</u>

Turning to the merits of Plaintiffs' claim, this Court begins by analyzing Plaintiffs' likelihood of success on the merits.[3]

---

[3] Defendants challenge the admissibility of several of Plaintiffs' declarations made upon "information and belief."  [63] at 11–13.  But those arguments go to the weight of the evidence, not its admissibility for the purposes of the present motion.  11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949 (3d ed. 2019).

## A. Likelihood of Success on the Merits

### 1. Trade Secret Claims

Plaintiffs seek to enjoin Defendants to prevent them for disclosing their trade secrets "relating to their pricing strategies, their advertising and marketing strategies, and their existing and potential customers" under the Defend Trade Secrets Act and the Illinois Trade Secrets Act (ITSA). [52] ¶ 4. Given the similarity of the statutes, this Court applies the same analysis to both claims. *See Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 831 (N.D. Ill. 2019). As relevant here, Defendants challenge Plaintiffs' trade secrets claims by: (1) contesting whether Plaintiffs took reasonable measures to keep their trade secrets confidential; and (2) disputing whether Defendants misappropriated Zeigler's information. [63] at 22–23.

As to Defendants' first argument, both statutes require that for information to be a trade secret, its owner must take reasonable measures to keep it secret. 765 ILL. COMP. STAT. 1065/2(d)(2); 18 U.S.C. § 1839(3)(B). Defendants state that Plaintiffs failed to appropriately guard their trade secrets by not immediately terminating Messrs. Chavez' and Maravelas' VinsSolutions system access upon their resignation. *Id*. at 22–23. Yet Mr. Chavez unexpectedly resigned on January 28, 2019; and Mr. Passer credibly testified that his VinSolutions access was terminated by January 29. Mr. Maravelas also unexpectedly resigned by text messaging Mr. St. Germain on Saturday, April 13, 2019. [54] (Ex. 2) (Ex. E) at 1. Mr. Passer testified that Zeigler terminated Mr. Maravelas' access only two days later. Thus, even without prior notice of Messrs. Chavez' and Maravelas' resignation, Plaintiffs still acted swiftly,

terminating Mr. Chavez' access within a day of his resignation and terminating Mr. Maravelas' by the next business day. This Court declines to rob Plaintiffs of their trade secret protection when they acted swiftly but not immediately. *Comput. Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 696 (N.D. Ill. 2004) (explaining that trade secret owners need only take reasonable, not perfect, measures to maintain secrecy).

Turning to Defendants' second argument, Defendants claim that no evidence proves that Messrs. Chavez or Maravelas "actually took any information from VinSolutions for their own purposes." [63] at 23. Even if that were true, the facts show they accessed the VinSolutions system in an unauthorized manner falling within the definition of misappropriation. 765 ILL. COMP. STAT. 1065/2(a); 18 U.S.C. § 1836(6)(A) (defining improper use to mean "breach of a duty to maintain secrecy" as well as "espionage through electronic means"). And both statutes define "misappropriation" as *either* unauthorized disclosure or unauthorized acquisition. 765 ILL. COMP. STAT. 1065/2(b); 18 U.S.C. § 1839(5).

To support their theory that Messrs. Chavez and Maravelas improperly acquired Plaintiffs' trade secrets, Mr. Zeigler testified credibly that Zeigler employees are not permitted to access the VinSolutions system after they resign. Plaintiffs' witness Mr. Passer also credibly testified that both employees logged onto the VinSolutions systems multiple times directly leading up to and following their resignations, until later termination of their access. *See also*, [70] (Ex. 1). Additionally, Plaintiffs presented evidence that Mr. Chavez signed both the

Agreement and Zeigler's Employee Handbook, both of which required him to maintain the confidentiality of Zeigler's sensitive information. [54] (Ex. 1) (B), (Ex. 2) (Ex. D). Mr. Maravelas also signed the Employee Handbook. *Id.* at (Ex. 2) (Ex. B).

This evidence supports Plaintiffs' claim that Messrs. Chavez' and Maravelas' unauthorized VinSolutions logins amounted to a breach of their duty to maintain the secrecy of that information and/or electronic espionage, and further provides strong circumstantial evidence that they may have stored or otherwise conveyed that information improperly. Indeed, courts have found similar unauthorized access of a company's electronic trade secrets to constitute misappropriation. *See, e.g., Comput. Assocs.*, 333 F. Supp. 2d at 696–97 (holding that the plaintiffs had a reasonable likelihood of success when the forensic records showed the defendants repeatedly accessed the plaintiffs' source code); *Liebert Corp. v. Mazur*, 827 N.E.2d 909, 926 (Ill. App. Ct. 2005) (finding a likelihood of success on the merits when the defendant admitted to accessing and downloading information without authorization hours after resigning). For these reasons, the record sufficiently shows conduct by Messrs. Chavez and Maravelas rising to the level of misappropriation.[4]

Plaintiffs have not, however, submitted evidence to show Mr. Stasek or Bill Stasek Chevrolet misappropriated their trade secrets. Plaintiffs speculate that the Stasek Defendants misappropriated their trade secrets by trying to obtain favorable pricing with the Daily Herald and because Mr. Maravelas frequently logged into the

---

[4] Defendants point to Mr. Chavez' and Maravelas' declarations that they do not remember accessing the VinSolutions system after resigning, [63] at 23, but this absence of recollection fails to counter the evidence in the record that their actions amounted to misappropriation.

VinSolutions system after he began speaking with Mr. Chavez and Mr. Stasek about working at Stasek Chevrolet. [54] at 31–32. Yet the information Plaintiffs provided to support this theory remains speculative at this point; and the parties' dueling declarations offer insufficient grounds to show that Plaintiffs are likely to succeed on the merits of this portion of their claim.

For these reasons, this Court finds that Plaintiffs have demonstrated a likelihood of success on the merits for their trade secret claims against Messrs. Chavez and Maravelas, but not against Mr. Stasek or Bill Stasek Chevrolet.

2. <u>Breach of Contract Claims</u>

Plaintiffs contend Mr. Chavez breached the Agreement in three ways: (1) by working for a competitor; (2) by inducing Mr. Maravelas to leave Ziegler Chevrolet and work for Stasek Chevrolet, and by inducing Mr. Stasek to hire Mr. Maravelas; (3) and by sharing Zeigler's confidential business information. [54] at 9–12. Defendants challenge the sufficiency of Plaintiffs' breach of contract claims.

*i. Choice-of-Law*

Initially, this Court must determine whether Michigan or Illinois law governs Plaintiffs' contract claims. The Agreement provides that Michigan law governs. [54] (Ex. 1) (Ex. B) at cl. 8. Yet Defendants maintain that Illinois law should govern because the contract's choice of law provision is unenforceable. [63] at 14. Here, the Agreement states that the contract will be governed by the "laws of the State of Michigan, County of Kalamazoo." Therefore, Defendants argue, it is unenforceable because Kalamazoo "has no ordinances relating to employment contracts between

private parties." *Id.* This Court finds Defendants' construction of the choice of law provision unreasonable and unpersuasive. Courts remain reluctant to render clear contractual provisions unenforceable without substantial reason to do so. No such reason exists here. *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) ("Like any contract provision, a forum-selection clause will be enforced unless enforcement would be unreasonable or unjust or the provision was procured by fraud or overreaching."). Merely mentioning a Michigan county, while stipulating the laws of Michigan govern, fails to render the parties' choice of law provision unenforceable.

Defendants next argue the provision is unenforceable because Illinois' choice of law analysis deems it so. [63] at 14–15. Under Illinois law, "an express contractual choice-of-law provision will be enforced unless it (1) violates the fundamental public policy of Illinois and (2) Illinois has a 'materially greater interest' in the litigation than the chosen state." *WTM, Inc. v. Henneck*, 125 F. Supp. 2d 864, 867 (N.D. Ill. 2000) (citing *Maher & Assocs., Inc., v. Quality Cabinets*, 640 N.E.2d 1000, 1006 (Ill. App. Ct. 1994)).

As to the first prong, Defendants argue the provision violates Illinois public policy because Michigan law is arguably more permissive of restrictive covenants in employment contracts than Illinois law. [63] at 15 (arguing that Illinois courts reject "blue penciling" and require additional consideration for non-compete agreements signed after employment). This argument fails as well. First, Plaintiffs' broad reading of Illinois public policy would render all choice-of-law provisions void unless

that forum's laws were the same as Illinois. But parties stipulate the governing law precisely because of variations in state law. *See WTM, Inc.*, 125 F. Supp. 2d at 868 (explaining that just because one state provides rights that are not available under another "does not invalidate a choice-of-law provision as contrary to public policy"). Second, Illinois law also supports restrictive covenants and the right of parties to freely contract. *See, e.g.*, *Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 92–93 (Ill. 2006). Thus, given the nature of the technical differences between Michigan and Illinois law, the record allows this contract to proceed under Michigan law as agreed by the parties. *Potomac Leasing Co. v. Chuck's Pub, Inc.*, 509 N.E.2d 751, 754 (Ill. App. Ct. 1987) (to violate public policy of Illinois the contractual provision must be "contrary to pure morals and abstract justice" or an "evil example and harmful to its people.").

Because enforcing the contract as written does not violate fundamental Illinois public policy, this Court's analysis is complete. In the alternative, however, this Court further finds that Illinois has no materially greater interest in this litigation than Michigan. Undoubtedly, Illinois has a material interest in this litigation—Defendants and Ziegler Chevrolet are all located in Illinois. But Michigan possesses a compelling interest in this litigation as well. Zeigler is a Michigan corporation and it maintains its principal place of business in Kalamazoo, Michigan. [50] at 2. Zeigler also owns and operates dealerships throughout Michigan. [54] (Ex. 1) ¶ 5. Additionally, Mr. Chavez' membership in the Performance Group and access to VinSolutions system provided him with confidential information about Ziegler's

Michigan dealerships. *Id.* at ¶¶ 36–38. In sum, the record fails to show that Illinois possesses a materially greater interest in this litigation than Michigan, further illustrating that Michigan law governs.

Thus, this Court finds the choice-of-law analysis requires it to apply Michigan law.

### ii. Consideration

Defendants next argue that a lack of consideration renders the Agreement unenforceable. [63] at 15. Defendants claim Mr. Chavez did not sign the Agreement until November 2017, several months after his employment began in August. *Id.* As such, Defendants argue, the Agreement lacked any new consideration from Zeigler to support such a change in his terms of employment. *Id.*

The record, however, shows otherwise. The parties dispute whether Mr. Chavez signed the Agreement in August or November, *compare* [74], *with* [63] (Ex. 4) ¶ 16, but even assuming Mr. Chavez did not sign the Agreement until November, adequate consideration still supports the Agreement under Michigan law. Even if Mr. Chavez signed the Agreement several months after he began working, Zeigler Chevrolet made signing the Agreement a condition of Mr. Chavez' continued employment [54] (Ex. 2) ¶ 39, and then employed him for nearly a year and a half following its execution. In this way, Zeigler Chevrolet provided new consideration in the form of ongoing employment, compensation, and benefits. Under Michigan law, these facts are more than enough to uphold the Agreement. *Lowry Comput. Prods. Inc. v. Head*, 984 F. Supp. 1111, 1115 (E.D. Mich. 1997) (finding that "continuing

employment is sufficient consideration"); *QIS, Inc. v. Indus. Quality Control, Inc.*, 686 N.W.2d 788, 789 (Mich. Ct. App. 2004) (noting that "mere continuation of employment is sufficient consideration in an at-will setting" and for that reason it "follows defendants received sufficient consideration if continuation of their employment hinged on signing" a non-compete agreement).

### iii. Reasonableness

Next Defendants challenge the enforceability of Agreement's non-compete provision claiming its breadth renders it unreasonable. [63] at 15–18. Under Michigan law, an employer may require employees to enter into certain reasonable restrictive covenants to protect the employer's competitive business interests. MICH. COMP. LAWS § 445.774a. To be enforceable, however, a non-compete clause must be: (1) "reasonably drawn as to its duration, geographical scope, and line of business; and (2) [protect] the legitimate business interest of the party seeking its enforcement." *Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 657 (E.D. Mich. 2007) (citing *Lowry*, 984 F. Supp. at 1113). If the scope of the non-compete is unreasonable, Michigan law permits the court to limit the agreement in order to render it reasonable. *Great Lakes Home Health Servs. Inc. v. Crissman*, No. 15-cv-11053, 2015 WL 6667772, at *4 (E.D. Mich. Nov. 2, 2015) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 547 (6th Cir. 2007)) ("To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.").

Here, the Agreement stipulates that Mr. Chavez may not work for "any automobile dealership or new or used vehicle dealership related entity" within 50 miles of any Zeigler location for a 24-month period. [54] (Ex. 1) (Ex. B) at cl. 1. Plaintiffs, however, ask this Court to enter a preliminary injunction narrower in scope than the terms of the Agreement. [52] at 3. The motion seeks to enjoin Mr. Chavez from working at "any automobile dealership or new or used vehicle dealership" within 50 miles of Zeigler Chevrolet for 24 months. *Id.*

Based upon the record, this Court finds the modified non-compete request reasonable and enforceable. Mr. Aaron Zeigler credibly testified regarding the highly competitive nature of the automobile sales industry, particularly in Chicago and its suburbs, noting that there were close to 80 Chevrolet dealerships within a 50-mile radius of Ziegler Chevrolet, including Stasek Chevrolet. Mr. Zeigler further testified that Zeigler Chevrolet maintains its competitive edge by compiling customer information over time, including information about when a customer's lease ends and the customer's specific buying habits. Mr. Zeigler further testified that Zeigler required Mr. Chavez to sign the Agreement because he served as a top executive who had "access to a tremendous amount of information" not only about Zeigler Chevrolet, but all Zeigler dealerships. Finally, Mr. Zeigler testified that Zeigler picked the non-compete terms after thoughtful consideration of customer buying cycles and where Zeigler gets most of its customers. He testified that client information is typically only useful for 24 months and that most of Zeigler's customers come from within a 50-mile radius. Given the evidence supporting the geographic scope and temporal

limitation for the non-compete clause and the fact that the non-compete does not ban Mr. Chavez from earning a living (either by working in a different kind of sales or by working at a dealership more than 50 miles away from Zeigler Chevrolet), the Agreement is reasonable, as modified by this Court. [5]

This Court also finds that Plaintiffs possess a legitimate business interest for enforcing the non-compete restriction. Michigan law "strongly supports the conclusion" that businesses have a legitimate business in restricting their former employees from directly competing against them, soliciting their customers and employees, and in protecting their confidential and proprietary information. *Kelly Servs.*, 495 F. Supp. 2d at 657. Michigan courts have also concluded that businesses posses a legitimate business interest in protecting their customer goodwill. *Certified Restoration Dry Cleaning Network*, 511 F.3d at 548. Thus, the provision serves a legitimate business as it guards against anticompetitive conduct of a key employee by preventing Mr. Chavez from inappropriately using his knowledge of Plaintiffs' confidential information and relationships with both employees and customers. *Id.* at 548–49 ("Accordingly, limited duration agreements that prohibit competition by person with access to confidential information have been upheld.").

---

[5] This Court's modification further includes a term to prohibit Mr. Zeigler from working for a competitor only for a period of 24 months starting from the date of Plaintiffs termination of access to any new customer information (January 29, 2019), rather than date of entry of this order. Such a modified time restriction sufficiently protects Plaintiffs' interests given that Mr. Zeigler himself testified that the useful shelf-life of Zeigler's customer information expires after about 24 months.

*iv. Breach*

Finally, Defendants argue that Mr. Chavez did not violate the Agreement because Mr. Zeigler told him that he would not prevent Mr. Chavez from working at Stasek Chevrolet. [63] at 18–20. Defendants' waiver, estoppel, and novation theories, however, remain unavailing. Mr. Zeigler credibly testified that at the time of those statements he did not know that Mr. Chavez would improperly access (and possibly divulge) Plaintiffs' trade secrets and confidential information and solicit its employees.[6] Indeed, the conversation Defendants rely upon begins with Mr. Zeigler imposing a caveat that so long as Mr. Chavez does not poach Zeigler Chevrolet's employees or act to Zeigler Chevrolet's detriment, it will not enforce the non-compete provision. [63] (Ex. 13). Defendants presented no contrary evidence on this point. For this reason, Plaintiffs can hardly be subject to waiver, estoppel, or novation based upon a conversation where Mr. Chavez withheld material information and Mr. Zeigler expressly stipulated that Zeigler Chevrolet would not enforce the non-compete so long as Mr. Chavez did not solicit or engage in anticompetitive conduct.

Defendants also argue that Mr. Chavez did not violate the Agreement's non-solicitation provision because Mr. Maravelas wanted to leave Zeigler Chevrolet prior to hearing from Mr. Chavez. [63] at 19–20, (Ex. 7) ¶¶ 6–17. That may be so, but these two things can be true at once—Mr. Maravelas could have been contemplating leaving Zeigler Chevrolet and Mr. Chavez could have inappropriately solicited him to leave and/or work for Stasek Chevrolet. In fact, Plaintiffs submitted extensive

---

[6] Mr. Zeigler also testified that he had not hired Cox Automotive to preform the VinSolutions systems login analysis until around the filing of this lawsuit, months after his conversation with Mr. Chavez.

evidence of phone conversations and text messages between Messrs. Maravelas and Chavez during the time period after Mr. Chavez quit and before Mr. Maravelas did. *See, e.g.*, [54] (Ex. 4) (Exs. A-C).

For example, prior to Mr. Maravelas leaving Zeigler Chevrolet, Mr. Chavez text messaged Mr. Stasek that he talked to "D [Dimitrios Maravelas] for like an hour just now." *Id.* at (Ex. A) at Stasek 0746. The next day, Mr. Chavez text messaged Mr. Stasek: "We need Dimitri so I can focus on other things besides dealing deals." *Id.* Even if Mr. Maravelas sought new employment, Plaintiffs presented a reasonable likelihood of success on their claim that Mr. Chavez' actions breached the Agreement's non-solicitation prohibition.

Accordingly, this Court finds Plaintiffs have shown a reasonable likelihood of success on their breach of contract claims.

### 3. Tortious Interference Claim

Finally, Plaintiffs assert they are likely to succeed on their tortious interference with contractual relationship claim against Defendant Stasek Chevrolet. [54] at 24–26. Plaintiffs assert that Stasek Chevrolet knew of the Agreement and induced Mr. Chavez to breach the Agreement's non-compete, non-solicitation, and confidentiality provisions. *Id.*

Under Illinois law[7], a claim for tortious interference with contract requires a showing that: (1) there is a valid contract; (2) the defendant knew of that contract; (3) the defendant intentionally and unjustifiably induced a party to breach that contract;

---

[7] The parties do not dispute that Illinois law governs this claim.

(4) a subsequent breach of that contract caused by defendant's wrongful conduct; and (5) damages. *Gen. Elec.*, 394 F. Supp. 3d at 834 (quoting *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018)). As previously discussed, the Agreement constitutes a valid contract. Plaintiffs also submitted evidence showing Stasek Chevrolet knew of the Agreement and its terms. [54] (Ex. 5) at Response to Int. Nos. 4, 5. Plaintiffs, however, failed to establish that Stasek Chevrolet induced Mr. Chavez to breach the Agreement and, relatedly, that Mr. Chavez' actions occurred as a result of Stasek Chevrolet's inducement.

Inducement "requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another." *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 802 (N.D. Ill. 2011) (quoting *R.E. Davis Chem. Corp. v. Diatonic, Inc.*, 826 F.2d 678, 687 (7th Cir. 1987), *modified on other grounds*, 924 F.2d 709 (7th Cir. 1991)). Instead, inducement must be shown through some active persuasion or encouragement. *Id.* Merely pointing to passive conduct that the defendant knows is likely to benefit him or her is insufficient. *Id.* at 802–03.

Here, Plaintiffs submitted Jeremy Stasek's text message conversations and phone records. [54] (Ex. 4) (Exs. C, D). But although those records reflect Mr. Stasek communicated with Mr. Chavez, they do not (without more) show that he actively encouraged Mr. Chavez either to solicit Mr. Maravelas or breach his non-compete. For example, Mr. Stasek's text message logs show that Mr. Chavez reached out to him stating that Mr. Chavez would love to hire Mr. Maravelas and that he spoke to

Mr. Maravelas for an hour.  *Id*. at (Ex. C) at Stasek 0443, 0451.  But there are no messages presently in the record that show Mr. Stasek encouraging Mr. Chavez to take these actions.

Plaintiffs also point to their April 16, 2019 letter to Stasek Chevrolet where they informed Stasek Chevrolet of Mr. Chavez' non-compete and demanded that it terminate Mr. Chavez.  [54] at 25; [50] (Ex. 6).  Plaintiffs assert that this letter shows Stasek Chevrolet induced Mr. Chavez to breach the Agreement's non-compete provision by continuing to employ him.  [54] at 25.  Yet putting Stasek Chevrolet on alert that Mr. Chavez breached his non-compete does nothing to answer the question of whether Stasek Chevrolet actively incited him to do so.  Even though Stasek Chevrolet's continued employment of Mr. Chavez opened the door for Mr. Chavez to continue to breach his contract, *Pampered Chef*, 804 F. Supp. 2d at 802, Plaintiffs' evidence fails to show a reasonable likelihood to establishing Stesek Chevrolet's inducement.  Because Plaintiff failed to support the inducement element, they necessarily also failed to show a connection between any inducement and Mr. Chavez' breach.  Accordingly, this Court holds that Plaintiffs have not demonstrated a likelihood of success on the merits of their tortious interference claim.

### B.      Irreparable Harm

Because Plaintiffs demonstrated a likelihood of success on their trade secret and breach of contract claims, this Court will next consider whether Plaintiffs have shown they will suffer irreparable harm.  *Vendavo*, 397 F. Supp. at 1143.  Based upon the record, they have done so.

Plaintiffs provided login information showing that Messrs. Chavez and Maravelas misappropriated Plaintiffs' trade secrets. *Id*. (noting that there is a "presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation"). And although Plaintiffs no longer provide Messrs. Chavez and Maravelas with access to the VinSolutions system, Messrs. Chavez' and Maravelas' willingness to logon after their resignation demonstrates a likelihood that absent a court order they may disclose confidential information in the future. *Vendavo*, 397 F. Supp. 3d at 1144 (explaining that courts may infer that a defendant who misappropriated trade secrets and likely remembers trade secret and confidential information will use those trade secrets again). This inference remains bolstered by the fact that Plaintiffs also provided text messages showing Messrs. Chavez' and Maravelas' ill-will towards Plaintiffs. *See, e.g.*, [54] (Ex. 4) (Ex. E) at D. Maravelas 315 (showing text messages between Mr. Stasek, Mr. Maravelas, and Mr. Chavez talking about writing negative reviews of Zeigler Chevrolet on Glassdoor.com and "crush[ing]" Zeigler Chevrolet). Finally, Plaintiffs also provided text message exchanges showing Mr. Chavez' willingness to solicit Plaintiffs' other employees. Given such evidence, Plaintiffs present a sound case that Mr. Chavez may engage in this behavior again towards either their employees or customers, and this satisfies Plaintiffs' irreparable harm showing.

## C. Inadequate Remedy at Law

For the next factor, a "remedy at law is inadequate if damages would not rectify" the harm. *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*,

402 F. Supp. 427, 437 (N.D. Ill. 2019). Here, the alleged harms fit that description. The risk that Messrs. Chavez and Maravelas will continue to divulge trades secrets and confidential information, as well as the risk that Mr. Chavez will continue to raid Plaintiffs' employees and customers could result in Plaintiffs losing "goodwill, competitive position, and continuity of business relationships with its customers and employees." *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006). Monetary damages cannot adequately cure these harms. *Id.*; *see also Liebert Corp.*, 827 N.E.2d at 929 ("Courts have found that the type of competitive losses alleged here often inflict irreparable injury and lack an adequate remedy at law, due to the difficulty in calculating the loss of existing and future business."). Thus, this Court finds that Plaintiffs demonstrated they lack an adequate remedy at law.

### D. Balance of the Harms

This Court must finally balance the harms to Plaintiffs of not granting the injunction with the potential injuries to Defendants and the public of granting the injunction. *Girl Scouts*, 549 F.3d at 1086. In balancing the harms, this Court employs a sliding scale approach—the more likely Plaintiffs are to succeed on the merits, the less heavily the balance needs to tilt in their favor. *Id.*

As noted above, Plaintiffs demonstrated a strong likelihood of success on their breach of contract and trade secret claims based upon the data they provided regarding Plaintiffs' VinSolutions system logins, call logs, and text messages. The law recognizes the harm from such unlawful employee misconduct and Plaintiffs have

further shown declining sales data immediately following Messrs. Chavez and Maravelas working at Stasek Chevrolet.

In contrast, the potential harm to Defendants is slight where they have no right to engage in the conduct prohibited by the proposed injunction and otherwise remain bound to comply with the employment agreements they executed. Consequently, "the balance of harm favors Plaintiff as to the injunction prohibiting any further trade secret disclosure." *Vendavo*, 397 F. Supp. 3d at 1145. The same holds true for Mr. Chavez' breach of the Agreement. Even though enforcing the Agreement will prohibit Mr. Chavez from certain employment opportunities, Mr. Chavez may still work in another field or work for a dealership over 50 miles away from Zeigler Chevrolet thereby minimizing the harm to him. *Turnell*, 796 F.3d at 666. Stasek Chevrolet may hire a new general manager and may still employ Mr. Maravelas. Finally, the public has an interest in ensuring that trade secrets remain protected and that businesses do not engage in anti-competitive conduct.

In sum, this Court determines that the balance of the harms weighs in Plaintiffs' favor.

## IV.    <u>Conclusion</u>

For the reasons stated above, this Court grants in part and denies in part Plaintiffs' amended motion for a preliminary injunction, pending further proceedings in this matter. [52].

Dated: January 15, 2020

Entered:

John Robert Blakey
United States District Judge